### State of Vermont v. Arthur Passino

[640 A.2d 547]

No. 92-078

Present: **Allen, C.J., Gibson, Dooley, Morse and Johnson, JJ.**

Opinion Filed March 18, 1994

Motion for Reargument Denied April 8, 1994

516

*James A. Hughes,* Franklin County Deputy State's Attorney, St. Albans, for Plaintiff-Appellee.

*Robert Appel,* Defender General, and *Henry Hinton,* Appellate Attorney, Montpelier, and *Arthur Passino,* pro se, Swanton, for Defendant-Appellant.

**Allen, C.J.** Defendant Arthur Passino appeals his conviction for involuntary manslaughter. He alleges that the trial court denied him his constitutional right to present evidence and confront witnesses against him. We agree and reverse.

On the evening of January 20, 1990, Shirley LeClerc was found dead in a vacant apartment, across the hall from the apartment she shared with her husband in Enosburg. She had been severely beaten and strangled, and evidence indicated that the victim had engaged in sex before her death. Soon after

her husband, Urbain LeClerc, found the body, defendant was discovered in an adjacent apartment. After speaking with LeClerc, defendant went to his mother's nearby home where he showered and, uncharacteristically, put several articles of clothing through the washing machine, including a pair of blue pants he had been wearing that day.

Defendant was charged with felony murder, allegedly having killed the victim with malice aforethought during a sexual assault. The nature of the crime made it likely that the perpetrator's clothes would have come in contact with the victim's blood. Pursuant to warrant, police seized the pants to conduct tests on stains in the material. A state police chemist identified four distinct stains containing human blood, which were cut from the pants and individually marked.

These blood samples and other evidence were forwarded to the Federal Bureau of Investigation in Washington, D.C., along with hair, blood and other body fluid specimens taken from the victim, defendant, and the victim's husband. The FBI subjected the samples to DNA profiling analysis, to determine whether any of the evidence could be traced to the individuals tested. Tests on semen found on the victim showed defendant to be the source, and positively excluded the husband. The FBI tested two of the four blood stains taken from defendant's pants; one produced inconclusive results, but the victim was positively excluded as the source of the other.

As required by discovery rules, the State notified the defense of its intent to use the DNA evidence at trial to establish that defendant was the source of the semen found on the victim's body. In response, defendant filed a motion in limine to preclude counsel from informing the jury of the DNA results in opening statements, contending that it was "unlikely that the DNA evidence for inclusion [will] be admitted." The court heard testimony on the DNA evidence in four days of hearings held on May 6–9, 1991.

To support introduction of the DNA profiling evidence identifying defendant as the source of semen, the State offered testimony from three expert witnesses: Dr. Dwight Adams, an FBI biologist with expertise in DNA analysis of forensic samples and the application of the FBI's methods in population genetics; Dr. Eric Buel, a forensic chemist with the Vermont State

Police also qualified as an expert in DNA analysis and its application to population genetics; and Dr. Charles Kilpatrick, a professor of zoology at the University of Vermont and expert in population genetics and DNA profiling. The witnesses offered detailed testimony about the technique of DNA profiling and the procedures employed and results obtained in this particular case.[1]

In essence, DNA profiling seeks to determine whether genetic material unique to an unknown source, such as evidence from a crime scene, matches genetic material from a known source, thereby linking the known source to the crime. The process comprises two stages. In the first stage, an x-ray image, or "autorad," of the DNA from the known and unknown sources is produced. If the DNA from those sources does not match, then the test is either deemed inconclusive or the known source is positively excluded as the source of the unknown DNA. If the DNA matches, the profiling proceeds to the second stage, wherein a statistical analysis of population frequencies is performed to determine that the known and unknown DNA match because they came from the same person, not because two unrelated individuals happen to have some identical DNA.

In summarizing its position regarding admissibility of the DNA test results purportedly showing defendant as the source of semen, the State argued, and the record supports, that the only issue was the validity of the second stage of the DNA profiling, the FBI's statistical analysis. In its argument on the DNA admissibility, the defense asserted that "D.N.A. evidence for inclusion, as offered in this case, is not proper evidence and the population frequency analysis is not proper evidence." Defense counsel also argued, "It's our position that [V.R.E.] 401 and 403 are violated by receiving D.N.A. evidence for inclusion. Exclusion is a substantially different matter. Certainly when the exclusions are clear and unequivocal."

In the suppression hearing, Dr. Adams testified that "an exclusion is absolute," in that the known source could not be the source of a particular body fluid. He also reported that of two blood samples taken from defendant's pants, one produced no

---

[1] For a detailed description of the DNA profiling process, see United States v. Jakobetz, 747 F. Supp. 250 (D. Vt. 1990), aff'd, 955 F.2d 786 (2d Cir. 1992).

DNA results, and the other showed "no DNA profiles which resembled the victim's blood whatsoever." In corroboration of this testimony, Dr. Kilpatrick opined that the one bloodstain that gave a result matched defendant's DNA, effectively ruling out the victim as the source of the blood.

The court's order excluding the DNA evidence expressly acknowledged that defendant contested only the FBI's probability calculations, which purportedly ruled out a coincidence in the match between defendant and semen found on the victim's body. The discussion was confined to the composition of the comparison database and the assumptions made about defendant's ancestry, two critical components of an accurate probability assessment. The court found the FBI probability analysis flawed, and held that "[b]ecause the probability estimates are such an integral part of the FBI's DNA profiling, the test results in this case must be suppressed," and added that results showing a match are not admissible without reliable statistics.

On June 4, 1991, the eighth day of a sixteen-day trial, the defense moved for compensation and expenses for the testimony of Dr. Kilpatrick as an expert witness. This came the day after the court decided to admit defendant's pants into evidence. In argument on the motion held that same day, defense counsel explained that Dr. Kilpatrick's testimony was needed to introduce the test results that had excluded the victim as the source of blood taken from one of the stains on defendant's pants. The State vigorously protested presentation of any DNA evidence. The prosecution pointed to the court's ruling in limine, the lack of requisite advance notice, and the fact that the defense counsel had made every effort to cull from the venire anyone with knowledge of DNA testing.

The defense countered that the motion in limine and hearings on the DNA evidence dealt only with the propriety of DNA evidence purportedly *including* defendant as the source of semen; the court's order did not preclude tests *excluding* the victim as the source of blood. The defense noted that, despite the lack of formal notice, Dr. Kilpatrick was listed as a State's witness, and had testified at length in the in limine hearing on the DNA evidence. The defense contended that a fair trial hinged on the ability to present this exculpatory evidence. The motion was denied, and defendant was precluded from presenting the exculpatory DNA evidence.

Later in the trial, the State introduced the results of traditional blood serology tests conducted on one of the blood stains not subjected to DNA analysis. The spot tested as type "A," the victim's blood type. Defendant attempted to cast doubt on the results by suggesting that the bloodstain could in fact have been "AB," defendant's blood type. He was precluded from introducing the DNA evidence that excluded the victim as the source of the blood in the other stain.

The defense contended that defendant and the victim had engaged in consensual intercourse, and that the victim's husband had killed his wife in a jealous rage after discovering her affair with defendant. After three days of deliberation, the jury delivered a verdict of guilty on the lesser-included offense of involuntary manslaughter. On appeal, defendant contends he deserves a new trial because the trial court denied him his constitutional right to present the exculpatory DNA evidence.

■■ The trial court excluded the DNA evidence as a sanction for failure to notify the State of the intended use of the scientific evidence and expert witnesses, Drs. Kilpatrick and Buel. Rule 16.1 of the Rules of Criminal Procedure empowers the trial court to require the defendant to disclose proposed scientific or expert evidence. V.R.Cr.P. 16.1(b). The rule also provides that, "[o]n request of the prosecuting attorney, the defendant's attorney shall disclose the names and addresses of persons whom he intends to call as witnesses at the trial." V.R.Cr.P. 16.1(c). In this context, Rule 16.1 strives to ensure the prosecution ample opportunity for pretrial preparation to respond to evidence involving medical or scientific expertise. See Reporter's Notes, V.R.Cr.P. 16.1(b).

■■ The trial court may order appropriate sanctions for violations of discovery rules. See V.R.Cr.P. 16.2(g). Our review of the sanctions imposed, including exclusion of expert testimony, is limited to an abuse of discretion. *State v. Meyers*, 153 Vt. 219, 223, 569 A.2d 1081, 1084 (1989). The discovery sanction aside, "[a] court's determination of whether to exclude expert testimony is discretionary and will not be disturbed" absent "a clear abuse of discretion." *Id.* at 224, 569 A.2d at 1085.

■ Nevertheless, the exclusion of a defendant's proffered evidence implicates the constitutional right to present a defense

and confront adverse witnesses.[2] *Michigan v. Lucas*, 500 U.S. 145, 147–50 (1991); see *Pennsylvania v. Ritchie*, 480 U.S. 39, 56 (1987). The right "'may, in appropriate cases, bow to accommodate other legitimate interests in the criminal trial process.'" *Rock v. Arkansas*, 483 U.S. 44, 55 (1987) (quoting *Chambers v. Mississippi*, 410 U.S. 284, 295 (1973)); *State v. Hugo*, 156 Vt. 339, 345, 592 A.2d 875, 879 (1991). But restrictions on the right to present evidence and confront witnesses "may not be arbitrary or disproportionate to the purposes they are designed to serve." *Rock*, 483 U.S. at 56. A defendant's Sixth Amendment rights may be violated by a discovery sanction that entirely excludes a defendant's proffered evidence. See *Taylor v. Illinois*, 484 U.S. 400, 409 (1988).

██ In *Lucas*, the Supreme Court reiterated that in most cases, alternative sanctions are "'adequate and appropriate.'" *Lucas*, 500 U.S. at 152 (quoting *Taylor*, 484 U.S. at 413). Circumstances could warrant preclusion if a less severe penalty "'perpetuate[s] rather than limit[s] the prejudice to the State and the harm to the adversary process,'" as would be the case if the defense engages in willful misconduct to gain a tactical advantage. *Id.* (quoting *Taylor*, 484 U.S. at 413). To assess the propriety of a preclusion sanction, this Court has employed a balancing test suggested in *Taylor*, which involves weighing a defendant's right to offer testimony against "'[t]he integrity of the adversary process . . ., the interest in the fair and efficient administration of justice, and the potential prejudice to the truth-determining function of the trial process.'" *State v. Edwards*, 153 Vt. 649, 649, 569 A.2d 1075, 1076 (1989) (quoting *Taylor*, 484 U.S. at 414–15). In light of this standard, we believe the trial court overstepped the bounds of its discretion in preventing defendant from offering the DNA evidence.

The court enumerated three reasons for precluding DNA evidence that excluded the victim as the source of blood. First, the defense gave the State insufficient notice to rebut the complex DNA profiling evidence, which, the court said, would have greatly prejudiced the prosecution. Second, the court perceived that defendant's request to introduce the DNA evidence of the

---

[2] "In all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him . . . ." U.S. Const. Amend. VI.

blood test was inconsistent with defense counsel's efforts to select a jury with no knowledge of DNA profiling, suggesting an attempt to use the evidence to its own advantage. Finally, the court noted that the proposed DNA evidence, which excluded the victim as the source of blood, was obtained through testing of only one of the four blood stains found on defendant's pants. Testing of one of the remaining stains through traditional blood typing techniques showed that the blood was type "A," the victim's blood type. The court characterized the different analyses performed on different stains as "inconsistent testing" that warranted exclusion of DNA evidence.

■ As to the first basis for preclusion, defendant concedes the failure to provide the requisite advance notice of Dr. Kilpatrick as a defense witness. Defense counsel offers no explanation for the failure to inform the State formally about the proposed use of exculpatory DNA evidence. Nothing, however, suggests that defense counsel willfully disregarded discovery requirements to obtain an unfair tactical advantage. Moreover, the State was aware that defendant was emphasizing the distinction between inculpatory and exculpatory DNA profiling. Defendant's original motion in limine was directed to "DNA evidence for inclusion." The hearings on the motion to exclude the DNA evidence focused on the validity of the FBI's methods of statistical analysis to rule out coincidences *in the event of a match*. Finally, defense counsel's summary argument at the close of the hearings clearly indicated that defendant's position with regard to exculpatory DNA profiling was another matter entirely. Defense counsel also informed the court that they would not offer the DNA evidence if the court did not admit defendant's pants into evidence.

■ Even if the prosecution had no inkling of defendant's intent to offer the exculpatory evidence before the motion for Dr. Kilpatrick's witness fees, the protestations of extreme prejudice are not supported by the prosecution's representations at the suppression hearing. First, at the hearing the State emphasized, and the record bears out, that the only disputed issue was the determination of probabilities of a match, not the methods employed to create an autorad image that could definitively exclude a known source such as the victim. The State also offered

Drs. Kilpatrick and Buel, defendant's proposed witnesses, as experts thoroughly versed in the FBI protocols used by their expert Dwight Adams to produce the autorads. All three of the State's experts agreed that the victim was not the source of blood in the one stain of the two tested that produced usable information. The hearing record shows that the State had thoroughly prepared these witnesses to offer testimony no different from that proposed by defendant less than one month later, at trial.

The State contends that it could not meet DNA evidence without the testimony of Dr. Adams, who performed the original tests. But at the suppression hearing, the prosecution specifically offered Dr. Kilpatrick as an expert familiar with all facets of the FBI DNA profiling procedure, who would attest to the acceptance of the FBI testing protocol in the scientific community. The State also represented that its witness had reviewed Dr. Adams' report and the test results, "where he finds a match, where the quality controls seem to have worked, and whether there were any problems that should have been noted on the autorads." Dr. Kilpatrick's testimony at the suppression hearing bore out the State's offer of proof. The late notice might have imposed some burden on the State, but the circumstances of this case belie the prosecution's contention that the burden would have been undue and extreme, especially if given time to prepare for cross-examination.

The court's second basis for preclusion was defense counsel's allegedly studied effort to keep venire persons with any knowledge of DNA profiling off the jury. Assuming this is true, the jury comprised individuals with no preconceived notions regarding this scientific identification procedure. They would have been educated by expert witnesses, whose function was to inform about matters such as DNA profiling that exceed the average person's knowledge and experience. See V.R.E. 702. The State, as opposing party, could have questioned any of the bases for opinions offered by the experts it originally intended to put on the stand to offer a presumably identical explanation of DNA profiling. We fail to see how the defense counsel's efforts at jury voir dire could have redounded to defendant's unfair advantage. In short, working for a jury ignorant of DNA profiling and offering DNA profiling evidence are

not necessarily inconsistent courses of action that would warrant preclusion of the evidence.

The trial court's third and final basis for preclusion was the "inconsistent testing" performed on different blood stains taken from defendant's pants. Conventional testing of one spot revealed blood of the victim's type; DNA profiling of another spot conclusively excluded the victim as the source. The results are not necessarily inconsistent. The jury could have concluded that both tests were accurate, so that one stain was blood from the victim and the other was not. The jury also could have found that the DNA test raised doubt concerning the reliability of the blood serology test. In any event, matters of credibility and weight of evidence are for the jury as fact-finder, not the court. *State v. Daigle*, 136 Vt. 178, 180, 385 A.2d 1115, 1116 (1978).

We believe that defendant was considerably prejudiced by preclusion of the exculpatory DNA evidence. Proof that blood of the victim's type was found on defendant's pants formed an important link between defendant and the crime. Though the defense contended that the degraded condition of the blood had produced a false reading, the exculpatory DNA evidence would have rebutted the State's evidence more effectively, or at least would have created doubt regarding defendant's connection to the scene. In other cases in which we have approved the sanction of preclusion, the cumulative nature of the proffered evidence helped tip the balance toward exclusion. See *Hugo*, 156 Vt. at 345, 592 A.2d at 879; *Edwards*, 153 Vt. at 649, 569 A.2d at 1076. Here, the DNA evidence was neither cumulative nor peripheral to the question of guilt.

In summary, our analysis leads us to conclude that the trial court should have imposed a sanction less severe than exclusion of evidence for defense counsel's failure to comply with notice requirements. Absent evidence that the defense willfully evaded compliance to gain an unfair advantage, a lesser sanction would not undermine the integrity of the adversary process. Presenting the exculpatory DNA profiling results to the jury, which the State had endorsed in the suppression hearing as highly relevant and probative evidence, would have promoted the fair and efficient administration of justice and advanced the truth-determining function of the trial process.

See *Taylor*, 484 U.S. at 414–15. The trial court's sanction unduly trammeled defendant's right to present evidence, and therefore was an abuse of discretion. In light of the importance of this evidence to defendant's case, and the fact that the evidence was not cumulative and would tend to rebut the State's test evidence, we cannot say that the erroneous exclusion was harmless beyond a reasonable doubt. *State v. Lynds*, 158 Vt. 37, 42–44, 605 A.2d 501, 503–04 (1991). Defendant must be given a new trial.

*Reversed and remanded.*