985 A.2d 32

James A. THOMPSON

v.

STATE of Maryland.

No. 78, Sept. Term, 2008.

Court of Appeals of Maryland.

Nov. 16, 2009.

Reconsideration Denied Jan. 12, 2010.

**666**

George E. Burns, Jr., Asst. Public Defender (Nancy S. Forster, Public Defender, and Suzanne Drouet, Asst. Public Defender, of Baltimore on brief), for petitioner.

Robert Taylor, Jr., Asst. Atty. Gen., (Douglas F. Gansler, Atty. Gen., of Maryland, of Baltimore), on brief, for respondent.

Argued before: BELL, C.J., HARRELL, BATTAGLIA, GREENE, MURPHY, ADKINS and BARBERA, JJ.

ADKINS, J.

In this case we are asked to apply revisions enacted in 2008 to Maryland Code (2001, 2006 Cum.Supp.), Section 8–201 of the Criminal Procedure Article (CP), granting expanded remedies to certain convicted persons based on DNA evidence. We must decide whether to apply the 2008 revisions to this case, even though it was decided by the postconviction court, and appealed to this Court, before the January 1, 2009 effective date of the new law. We shall hold that the 2008 revisions apply to this case, meaning that Petitioner has a direct right of appeal to this Court, and that, as we vacate the postconviction court's order, on remand Petitioner is entitled to the benefit of the more liberal standard set by the 2008 legislation for determining his eligibility for a new trial.

## FACTS AND LEGAL PROCEEDINGS

On August 2, 1987, Colleen Williar was found dead in her home. She was nude and had been stabbed, strangled, and sexually assaulted. The Petitioner, James Thompson, lived near her home. The day after Williar's body was discovered, Thompson approached police with a knife and told them that he found the knife in a grassy area near Williar's home. He surrendered the knife to the police and also turned over a pair of bloodstained cut-off jeans he claimed he was wearing when he found the knife.

In an interview with police a few days later, Thompson revealed that the knife belonged to him and went missing

prior to August 1st. According to Thompson, his purported accomplice, James Owens, told him where to find the knife on the morning of August 2nd. Thompson also told police that when disclosing the location of the knife, Owens told him that he had sex with and " 'copped dope from' " Williar. Based on these allegations and other circumstantial evidence, Owens was charged as the sole perpetrator of the rape and murder of Williar.

### Trial Of James Owens

Owens's trial began in February, 1988. In the months leading up to the trial, police and the prosecutor conducted multiple interviews of Thompson, during which his story changed several times. The prosecutor from Owens's trial testified at Thompson's trial that on February 26, 1988:

I brought [Thompson] in and I went over his testimony for what may have been the sixth time and I pointed out to him that the business about him finding the knife is where the defense attorney is going to hammer at him and that he's going to look silly and isn't it time that he finally leveled with us and told us the truth about how that knife really got back into his possession.

Thompson expressed concern about changing his story and then stated that, rather than finding the knife, Owens brought him the knife the morning after the murder.

Later that day, Thompson was called as a State's witness. His testimony was inconsistent with the chronology of events the morning after the murder and appeared so untruthful that the prosecutor was worried about the "prognosis of the case[.]"

Over the following weekend, the prosecutor asked detectives to collect blood and pubic hair samples from Thompson in the hopes of proving that Thompson was not a participant in the crime. Thompson provided the samples voluntarily on February 28, 1988. The prosecutor testified that after receiving the result of the pubic hair testing, Thompson "was clearly a suspect" and he sent detectives to bring Thompson in for

questioning on February 29, 1988. Detective Dunnigan testified that he began the interview by telling Thompson that he was in "a lot of trouble and that he could not get in any more trouble he [was] already in." According to Sergeant Landsman, who was also present, they told Thompson he would be "charged with something[,]" but would not specify what. They also told Thompson that his blood and hair had been found at the scene, though at the time they said this, they did not know whether this was true. Dunnigan later testified that each time they provided him with more details about this evidence, Thompson's story changed.

During the interrogation, Thompson provided at least four new versions of the story: (1) that he had broken into Williar's house and stolen jewelry, but only after police had investigated and left the home; (2) that he went into the house after Owens had left, remained on the first floor and looked at the electronics in the house; (3) that he and Owens entered before Williar was killed and that he waited in the living room during the burglary with Owens; and (4) that he had hidden in the upstairs bathroom and seen Owens attacking Williar. After the fourth version of the story, the detectives reminded Thompson that the hair evidence found on the victim's buttocks was pubic hair, at which point Thompson told the detectives that he had been in Williar's bedroom when Owens attacked her, and that he masturbated during the attack, which would account for the pubic hair.

Police believed this version of the story was sufficient so the interrogation ended. Thompson was taken directly to the witness stand, and testified that he and Owens broke into Williar's home by breaking a basement window and began "rummaging through the drawers in the bedroom" on the second floor. Thompson testified that during the course of the burglary, Williar came home and proceeded up the steps to the second floor. At this point, Thompson hid in the bathroom and Owens assaulted Williar when she entered the bedroom. Thompson testified that when Owens began hitting Williar in the face, he came out of the bathroom and encouraged Owens to leave. Owens threw Williar on the bed and

beat and raped her while Thompson watched. Thompson testified that he "had [his] privates and things out[,]" masturbated, and ejaculated. Thompson testified that after Owens raped Williar, he stabbed her in the chest. According to Thompson, Owens threw Williar on the bed and threw the knife on the floor in the hallway. Thompson testified that he picked up the knife and fled with Owens. Thompson was taken into police custody after he left the courtroom. On March 2, 1998, Owens was convicted, *inter alia,* of felony murder and burglary, but was acquitted of the rape.

On April 7, 1988, Owens's counsel represented that Thompson "was tricked by the police" into making his statement and that he lied under oath. These assertions formed the basis for a new trial motion on behalf of Owens, which was denied.

### *Trial Of James Thompson*

Thompson's testimony at Owens's trial was later presented against him at his own trial. The State presented corroborating evidence from criminalist Mark Profili that the blood found on Thompson's pants was type A—the same type as Williar's—and that one of the pubic hairs found on the victim's back matched the sample taken from Thompson. Profili also testified that a pubic hair was found on Colleen Williar that did not match Williar, Thompson, or Owens. Pathologist Dennis Smyth, M.D. testified that semen was found in Williar's vagina and that the sperm were disintegrating, a process that occurs "from seven to twenty-four hours after they are deposited." Dr. Smyth explained the sperm disintegration timeline, which inferentially placed the deposit time near Williar's death: "They start disintegration almost immediately. They will be undetectable or totally disintegrated in a time span of seven to twenty-four hours." The defense did not present any witnesses.

In closing argument, the State told the jury that sperm taken from Williar during the autopsy came from the rapist. The State emphasized that the blood found on Thompson's jeans was the same blood type of Colleen Williar and linked

this with testimony that blood of an unspecified type [1] was found on the murder weapon:

> [T]hat knife is the murder weapon. It is positive for blood. It is consistent with the wound on Colleen Williar's body and also these pants.
>
> James Thompson's shorts, if you will. They test positive in this corner of the pocket for a positive blood. **That is the blood of Colleen Williar.** He said when he got the knife the knife was bloody and he put the knife in his pants. Clearly the blood from the knife. And we know there was blood on the knife. It had seeped onto his shorts and he didn't notice.

(Emphasis added.) The prosecutor also linked the burglary, rape, and murder as having been committed by the same persons at the same time:

> ... Colleen Williar didn't let some man in who came in upstairs, slept with her and then killed her. No. The people who broke the glass in the basement were the same people who came upstairs, forced themselves on her body on her bed and left the glass while they were doing it.

The State also pointed to, *inter alia,* Thompson's confession and the pubic hair match.

The defense's closing argument called into question the pubic hair testimony, particularly the hair that did not belong to the victim, did not belong to Thompson, and did not belong to Owens. Defense counsel posed the question "Was there a third person?" The defense also suggested that Thompson's testimony at Owens's trial was not a confession because "Thompson was only saying what the State ... [and] the police wanted him to say."

Thompson was convicted of rape, burglary, felony murder, and a weapons offense. He was sentenced to life in prison

---

1. Profili testified that the knife was not subjected to more specific testing other than to indicate that the substance found on it was indeed blood.

plus a three-year sentence for the weapons offense. The sentences were merged.

## Motion for Release of Evidence to Conduct DNA Analysis

On July 20, 2004, Thompson filed a Motion for Release of Evidence to Conduct DNA Analysis in the Circuit Court for Baltimore City pursuant to CP Section 8–201. On August 31, 2005, the Circuit Court denied Thompson's motion on the ground that Thompson had not addressed CP Section 8–201(c)(2) to establish that "the requested DNA test employs a method of testing generally accepted within the relevant scientific community." On November 17, 2005 the postconviction court granted a motion for reconsideration, vacated its order of August 31, 2005, and granted in part the petition for DNA testing. Thompson appealed the partial denial to this Court and we reversed the denial in an October 2006 opinion in which we gave Thompson the testing he requested.[2]

## Petition For Postconviction Relief
## And Motion For New Trial

On December 15, 2006, Thompson filed a Petition for Post-conviction Relief and Motion for New Trial. Thompson contended that "[n]ewly discovered DNA testing conclusively establishes that two innocent men were wrongly convicted for the 1987 rape and murder of Colleen Williar." The motion stated that the laboratory results excluded both Owens and Thompson as depositors of the sperm on the cytology slide and that the testing on Thompson's blue jeans at the location

---

2. Thompson filed a direct appeal to the Court of Appeals pursuant to Maryland Code (2001, 2006 Cum.Supp.), Section 8–201(j)(6) of the Criminal Procedure Article (CP). This Court reversed the Circuit Court's order and remanded the case. *Thompson v. State*, 395 Md. 240, 261, 909 A.2d 1035, 1048 (2006). Writing for the Court, Judge Raker stated that "[t]he Circuit Court acted prematurely in ordering retention of samples sufficient for retesting on the record before it." *Id.* at 250, 909 A.2d at 1042. We also held that "[i]n the absence of statute or a rule promulgated by this Court, the Circuit Court does not have the inherent power to create an exclusionary rule of evidence under a statute that itself does not have an exclusionary rule." *Id.* at 259, 909 A.2d at 1047.

of the bloodstain showed that the blood did not come from the victim. Owens, through separate counsel, also filed for relief. At Thompson's June 27, 2007 hearing, it was revealed that the State joined in Owens's petition for a new trial because the newly discovered evidence would assist the defense and was not available in 1987, but that the State did not take this posture toward Thompson's postconviction case.

In the postconviction court's Memorandum Opinion and Order, issued October 5, 2007, it denied the Petition for Post Conviction Relief. The postconviction court collectively addressed the following two allegations of error by Thompson:

1. The Petitioner is entitled to a new trial because the jury did not fairly consider the real controversy and because the State's theory of the case has been refuted.

2. The Petitioner claims that neither the false confession nor the microscopic hair analysis outweighs the DNA evidence.

The postconviction court acknowledged that DNA evidence has a "strong and almost persuasive finality in criminal law" as well as in "countless case law where people have confessed to things for which they did not commit or professed their innocence and have DNA evidence exculpate them from the crime they were accused."

The postconviction court went on to address Thompson's felony murder conviction and stated that the DNA evidence removed the possibility that Thompson was the rapist:

The Petitioner in the instant matter professed his innocence regarding the actual perpetration of this murder. His story evolved to include not only breaking into the home but willfully standing by as the victim was raped. The Petitioner initially claimed that he was not involved in the murder but was a concerned citizen who had located the murder weapon. Subsequently, he claimed that he was a mere burglar and never touched the victim. Despite the evolution of his story, there has been little shown to refute the actual testimony he gave at the trial of James Owens. At

the trial of James Owens, the Petitioner admitted his involvement in the crime as a burglar.

> [Defense Counsel]: So what you're feeling is that you're a burglar, but you're not a killer, right?

> [Thompson]: That is exactly right.

The Petitioner under oath retold the story of how James Owens and he broke into the house of the victim, Collen Williar, ransacked the apartment as the Petitioner watched as another person raped and murdered the victim while he masturbated.

> The Court does take notice of the inconsistencies between the DNA evidence and the evidence at trial. Nonetheless, this Court has examined the ever-evolving story of the Petitioner from the time of the James Owens trial to that of his own. The State was adamant in its assessment that the Petitioner participated not only in the burglary but also the rape and murder. The State utilized the confession of James Thompson at the trial of James Owens in addition to the blood found on his pants, the pubic hairs discovered on the victim and the spermatozoa evidence. The evidence was collected and used against the Petitioner to convict him of first-degree felony murder, rape and burglary. The DNA evidence eliminates the possibility that the Petitioner had in fact raped the victim. Furthermore, the evidence presented at the Post Conviction hearing usurps the State's arguments all together concerning the scientific evidence in regard to the semen, pubic hairs and blood on the Petitioner's clothing. Thus, this Court is convinced because of the prevailing evidence that the Petitioner was not the actual rapist.

The postconviction court concluded that the DNA evidence did not remove Thompson from the scene of the crime and thus could not exculpate him on a felony murder charge:

> However, the standard as provided in the Maryland Rules does not require this Court to examine the weight of evidence or even the efficiency of counsel. The standard before this Court is whether the DNA evidence will excul-

pate the Petitioner from the crime for which he was convicted. Maryland Rules 4–331(c)(3).

The Petitioner was convicted of felony murder, the underlying felony being burglary. It seems readily apparent from the Petitioner's testimony that he indeed burglarized the home of the victim the night of the murder.

The DNA evidence does not remove the Petitioner from the scene of the crime. The DNA evidence does eliminate the Petitioner from being the ultimate rapist. Yet, even in the Petitioner's testimony at the trial of James Owens, he never claims to be the actual murderer or rapist. His claim was that he stood by as the event occurred. Since the DNA evidence does not show that the Petitioner is innocent of the underlying crime of burglary, coupled with his confession stating that he burglarized the house as the victim was murdered, this Court does not concur with the Petitioner that the DNA evidence exculpates him of the primary crime of which he was accused-felony murder. This Court denies the Petitioner's Motion for a New Trial.

### *Appeals*

On October 26, 2007, Thompson filed, *inter alia*,[3] a Notice of Appeal to this Court under CP Section 8–201(j)(6). On June 9, 2008, the Court of Special Appeals issued the following order:

ORDERED, pursuant to Maryland Rule 8–132 and CP § 8–201(j)(6), that appellant's October 26, 2007 "Notice to the Court of Appeals in the above-captioned action from the Circuit Court's Order, dated October 5, 2007, denying his Petition for Postconviction Relief and Motion for New Trial" is hereby transferred to the Court of Appeals of Maryland; and, it is further

ORDERED that, pending the conclusion of proceedings in the Court of Appeals on the matter being transferred, all

---

**3.** He also filed a Notice of Appeal to the Court of Special Appeals, and an Application for Leave to Appeal to that Court.

further proceedings in this Court are hereby STAYED concerning (a) appellant's October 26, 2007 direct appeal to this Court, (b) appellant's October 26, 2007 application for leave to appeal to this Court, and (c) appellee's motion to dismiss appellant's October 26, 2007 direct appeal to this Court.

We issued a writ of certiorari on September 10, 2008. Thompson presents the following questions:

I. Whether the postconviction court failed to use the proper standard for evaluating DNA evidence pursuant to CP Section 8–201?

II. Whether the postconviction court erred by denying Thompson's request for a new trial based on DNA testing results?

## I.

### Jurisdiction

The State's brief commences with a motion to dismiss, arguing that this Court does not have direct or certiorari jurisdiction to hear this matter.

### *Direct Appellate Jurisdiction Under CP Section 8–201(j)(6)*

The State contends that Thompson does not have available to him a direct appeal arising under CP Section 8–201(j)(6) because this provision, at the time of Thompson's postconviction proceeding, only provided for direct appeal when the postconviction court either (1) does not order DNA testing; (2) does not open or reopen a postconviction proceeding; or (3) orders destruction of evidence over the defendant's objection. The State argues that because these provisions do not encompass Thompson's challenge to the postconviction court's denial of his motion for new trial, his appeal is precluded from review by this Court.

At the time of Thompson's appeal in 2007, CP Section 8–201(j)(6) provided: "[a]n appeal to the court of appeals may be

taken from an order entered under subsection (c), (h)(2), or (j)(4) of this section." [4] Subsection (c) provides a postconviction petitioner a direct appeal to this Court if the postconviction court does not order DNA testing, but DNA testing was ordered here. Subsection (h)(2) provides petitioners with a method of direct review when the Circuit Court does not open or reopen a postconviction proceeding pursuant to Sections 7–102 and 104 of the Criminal Procedure Article. Here, however, the postconviction court *did* reopen Thompson's petition.[5] Because Thompson did not meet any of the prerequisites for

---

**4.** CP Section 8–201(c) provided:
> *Findings requiring DNA testing.*—Subject to subsection (d) of this section, a court shall order DNA testing if the court finds that:
> (1) a reasonable probability exists that the DNA testing has the scientific potential to produce exculpatory or mitigating evidence relevant to a claim of wrongful conviction or sentencing; and
> (2) the requested DNA test employs a method of testing generally accepted within the relevant scientific community.

CP Section 8–201(h)(2) provided:
> If the results of the postconviction DNA testing are favorable to the petitioner, the court shall:
> (i) if no postconviction proceeding has been previously initiated by the petitioner under § 7–102 of this article, open a postconviction proceeding under § 7–102 of this article; or
> (ii) if a postconviction proceeding has been previously initiated by the petitioner under § 7–102 of this article, reopen a postconviction proceeding under § 7–104 of this article.

CP Section 8–201(j)(4) provided:
> If a person files written objections to the State's notice that it intends to dispose of scientific identification evidence, the court shall hold a hearing on the proposed disposition of the evidence and at the conclusion of the hearing, if the court determines by a preponderance of the evidence that:
> (i) the evidence has no significant value for forensic science analysis, the court may order the return of the evidence to its rightful owner, the destruction of the evidence, or other disposition as provided by law; or
> (ii) the evidence is of such size, bulk, or physical character that it cannot practicably be retained by a law enforcement agency, on a showing of need, the court shall order that the evidence be made available to the party objecting to the disposition of the evidence for the purpose of obtaining representative samples from the evidence in the form of cuttings, swabs, or other means, prior to the release or destruction of the evidence.

**5.** CP Section 8–201(j)(4), which addresses the destruction of evidence over the defendant's objections, also does not apply here.

appeal provided by the 2007 version of CP Section 8–201(j)(6), he has no avenue for appeal under that iteration of the statute.

CP Section 8–201 was revised in 2008 to provide, *inter alia,* broader appeal rights and more liberal standards for the granting of new trials. The General Assembly, in Chapter 337 of the Acts of 2008, effective January 1, 2009, modified the appeal provisions of CP Section 8–201 to read as follows: "[a]n appeal to the court of appeals may be taken from an order entered under this section." CP § 8–201(k)(6). CP Section 8–201 was also modified to add a new subsection (c) providing:

*New trial.*—A petitioner may move for a new trial under this section on the grounds that the conviction was based on unreliable scientific identification evidence and a substantial possibility exists that the petitioner would not have been convicted without the evidence.

The revised statute also added a new subsection (i)(2), which contains the following new trial provision:

(2) If the results of the postconviction DNA testing are favorable to the petitioner, the court shall:

(i) if no postconviction proceeding has been previously initiated by the petitioner under § 7–102 of this article, open a postconviction proceeding under § 7–102 of this article;

(ii) if a postconviction proceeding has been previously initiated by the petitioner under § 7–102 of this article, reopen a postconviction proceeding under § 7–104 of this article; or

**(iii) on a finding that a substantial possibility exists that the petitioner would not have been convicted if the DNA testing results had been known or introduced at trial, order a new trial.**

(3) If the court finds that a substantial possibility does not exist under paragraph (2)(iii) of this subsection, the court may order a new trial if the court determines that the action is in the interest of justice.

(Emphasis added.) Thompson contends that we should apply both the new trial and appeal modifications retroactively and allow this appeal.

### Retroactive Application

During oral argument before this Court both parties agreed that there was no legislative history that would shed light on the legislative intent regarding retroactive application of the appeal or new trial provisions in CP Section 8–201. Our legislative research has likewise proved to be unfruitful. Thus, we look to our jurisprudence on the subject of retroactivity.

"The terms 'retroactive' and 'retrospective' are synonymous in judicial usage and may be employed interchangeably. They describe acts which operate on transactions which have occurred or rights and obligations which existed before passage of the act." 2 Norman J. Singer, *Sutherland's Statutory Construction*, § 41.1, at 372–73 (6th ed.2001) (footnote omitted). In a recent decision of this Court, also involving CP Section 8–201, Judge Barbera summarized Maryland law of retroactivity:

> Statutes are presumed to operate prospectively; consequently, absent manifest legislative intent to the contrary, statutes may not be given retrospective or retroactive application. *See Langston v. Riffe*, 359 Md. 396, 406, 754 A.2d 389, 394 (2000). There are, however, exceptions to the presumption that legislation is to be applied prospectively. "One such category of exceptions concerns legislative enactments that apply to procedural changes." *Id.* at 406–07, 754 A.2d 389[.]
>
> Legislative enactments that have remedial effect and do not impair vested rights also are given retrospective application. *Langston*, 359 Md. at 408, 754 A.2d at 395. " 'Generally, remedial statutes are those which provide a remedy, or improve or facilitate remedies already existing for the enforcement of rights and the redress of injuries.' " *Id.*

*Gregg v. State*, 409 Md. 698, 714–15, 976 A.2d 999, 1008 (2009) (some citations omitted). We also said in *Gregg* that CP Section 8–201 is "procedural in nature" and "is also a remedial statute, as its purpose is to provide a remedy for persons convicted of serious crimes of which they are actually innocent." *Id.*

■ Although *Gregg* said that CP Section 8–201 was procedural, it was not addressing the right of appeal set forth in subsection (j)(6).[6]  Because it is unclear whether, in this context, the right of appeal is a procedural or substantive right, we examine whether the amendment to subsection (j)(6) fits within the *Gregg* rule as a remedial enactment, which can be applied retroactively.

Thompson contends that he was actually innocent and that DNA evidence, not offered at his earlier trial, will persuade the jury to acquit him.  The postconviction court found, based on the new DNA evidence, that Thomson did not rape the victim.  But the court denied him a new trial based on this evidence because "the DNA evidence [does not] exculpate[ ] him of the primary crime of which he was accused—felony murder."  Thompson seeks to appeal this decision, taking advantage of the 2008 revisions to CP Section 8–201, which would give him two remedies:  (1) a more liberal standard— "substantial possibility" of acquittal—for proving the right to a new trial than the Rule 4–331 standard, which requires a showing of actual innocence;  and (2) a direct right of appeal to the Court of Appeals.

His goal is to persuade the postconviction court that, in light of the new DNA evidence, he should have his case re-adjudicated by a fact-finder and thereby redress a wrongful conviction.  We conclude that these new provisions are remedial in nature as they allow him to reach the substantive issue of guilt by lowering the bar to obtaining a new trial and according greater access to this Court.  Thus, under *Gregg*, the expanded right of appeal accorded by the 2008 statute should be applied retroactively.

But Thompson has one more hurdle to surpass before his right to appeal to this Court is secured.  CP Section 8–201 grants a right to appeal from "an order entered under this section."  Thompson must persuade us that the denial of his

---

6. When the 2008 amendments were enacted, subsection (j)(6) of Section 8–201, which addressed the right of appeal to this Court, became subsection (k)(6).

new trial motion was made under CP Section 8–201. Thompson's dilemma is that he made his motion pursuant to Maryland Rule 4–331, the general rule governing motions for new trial. Presumably, he did not file the motion for new trial under Section 8–201 because he *could* not—at that time, the postconviction court had no authority to grant a new trial under CP Section 8–201. So, we must decide whether, for purposes of the Section 8–102(k)(6) right of appeal, we will treat his Rule 4–331 motion as the equivalent of a CP Section 8–201(c) or (i)(2) motion.

This is more than a question about retroactivity, although retroactivity is involved. What makes the issue more than a mere question of retroactivity is that, by deeming his 4–331 motion to be an 8–201 motion, we open up the potential for reversing or vacating the postconviction court for failing to do something that the statute did not permit it to do at the time its order was issued. This is a concern. Yet, to say that Thompson cannot receive the benefit of the remedial provisions of CP Section 8–201 simply because he failed to foresee the enactment of this legislation in characterizing his motion, would be contrary to the retroactivity analysis we just made. He made a motion for new trial, and he sought other relief under the then existing terms of CP Section 8–201. We see nothing else he could have done. Changes in the law during the pendency of a case create conundrums for trial and appellate courts. But whether the change is statutory or by judicial modification of the common law, there is certainly precedent for asking lower courts to reconsider matters under new standards that did not exist when they initially decided the case. *See, e.g., Hiligh v. State,* 375 Md. 456, 825 A.2d 1108 (2003); *Facon v. State,* 375 Md. 435, 825 A.2d 1096 (2003); *Williams v. State,* 375 Md. 404, 825 A.2d 1078 (2003).[7]

For the reasons set forth above, we conclude that, for purposes of applying the CP Section 8–201(k)(6) right of direct appeal, Thompson shall be deemed to have "taken [his appeal]

---

7. These three cases involved a judicial modification of the common law. In *Williams v. State* we held, for the first time, that "the deliberate and

'from an order entered under [that] section." Thus, we hear this case as a direct appeal under CP Section 8–201(k)(6).

### The State's Other Jurisdictional Challenges

Our conclusions above also dispose of the State's jurisdiction arguments that (1) this Court is divested of certiorari jurisdiction in this matter because Maryland Code (1974, 2006 Repl. Vol.), Section 12–202 of the Courts and Judicial Proceedings Article ("CP") precludes our assuming jurisdiction when the Court of Special Appeals has granted an application for leave to appeal, but has not yet decided the matter because of its stay order and (2) Thompson failed to exercise the due diligence requirement of Maryland Rule 4–331 because he was aware of the availability of DNA testing at the time of trial and the evidence is therefore not "newly discovered." Because we assert our jurisdiction only pursuant to the direct review provision of CP Section 8–201 and do not take up the appeals based on Maryland Rule 4–331 or the Application for Leave to appeal, we need not address these challenges by the State.

.

## II.

### DISCUSSION

■ When the postconviction court analyzed Thompson's CP Section 8–201 claim, it employed Maryland Rule 4–331(c)(3) as the applicable standard:

---

unnecessary violation of an accused's right to prompt presentment" needed to "be given special weight" in determining the voluntariness of a criminal confession. 375 Md. 404, 430, 825 A.2d 1078, 1093 (2003). The *Williams* court then found that the trial court "did not give that violation the proper weight" in considering the voluntariness of Williams's confession. *Id.* at 434, 825 A.2d at 1095. In applying *Williams* to *Facon v. State*, 375 Md. 435, 825 A.2d 1096 (2003) and *Hiligh v. State*, 375 Md. 456, 825 A.2d 1108 (2003), we held the trial courts in those cases to the "special weight" standard adopted in *Williams*, despite the nonexistence of that standard at the time of the petitioners' trials. In *Facon*, we held that the Petitioner was entitled to have the court apply the new *Williams* rule, even while recognizing "that the trial judge did not have the benefit of our discussion in [*Williams*.]" *Facon*, 375 Md. at 453 n. 5, 825 A.2d at 1106 n. 5.

[T]he standard as provided in the Maryland Rules does not require this Court to examine the weight of evidence or even the efficiency of counsel. The standard before this Court is whether the DNA evidence will exculpate the Petitioner from the crime for which he was convicted. Maryland Rule 4–331(c)(3).

Thompson argues that this was the wrong standard and the State concedes the point. The State also concedes that, if we have jurisdiction, we should remand the case "to the [postconviction] court for reconsideration under the appropriate standard." [8]

Thompson advances a substantial or reasonable possibility test:

For DNA claims presented pursuant to the procedures set forth in CP § 8–201, the appropriate standard is that used in evaluating other types of newly discovered evidence, such as that presented in *Brady* claims: whether there is a substantial or "reasonable possibility" that the newly discovered evidence would have produced a different result.

The State maintains that "the appropriate standard is whether there is a 'reasonable probability' that the test results would lead to a different result from the finder of fact[,]" although it acknowledges appellate decisions saying that " 'reasonable probability' and 'substantial possibility' are synonyms." [9]

As we explained in the previous section, we will apply the 2008 version of CP Section 8–201 retroactively. Accordingly,

---

**8.** The State also argues, in the alternative that "if this Court wishes to make its own factual determinations as to whether the results of the DNA test created a 'reasonable probability' of a different verdict, [then] Thompson is not entitled to a new trial under the facts of this case." We do not take up the State's invitation to make factual determinations, as that is not the role of an appellate court.

**9.** The State refers, *inter alia,* to *Wilson v. State,* 363 Md. 333, 347 n. 3, 768 A.2d 675, 682 n. 3 (2001) and its recognition that the "reasonable probability" test in *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), means "substantial possibility."

the appropriate standard for the postconviction court to apply is that set forth in subpart (c) of the 2008 statute: [10]

> *New trial.*—A petitioner may move for a new trial under this section on the grounds that the conviction was based on unreliable scientific identification evidence and a substantial possibility exists that the petitioner would not have been convicted without the evidence.

We shall order this remand, but before we do, there are additional issues to address regarding what evidence the postconviction court should consider as it applies this standard.

### Allegations Of Postconviction Court Error

The sources of error identified by Thompson are (1) the DNA evidence contradicted the State's theory of the case; (2) the burglary, the rape, and the murder are intertwined and equally affected by the DNA evidence; and (3) the postconviction court erred by failing to consider whether the jury would have evaluated the "confession" differently if presented with the DNA evidence. He asks us to reverse the postconviction court, and although he does not say explicitly, implies that he seeks a remand with instructions to consider whether there is a substantial possibility that the jury would arrive at a different verdict if it heard the DNA evidence.

---

**10.** We note that this is in keeping with the standard employed by many other jurisdictions. *See, e.g., Bedingfield v. Commonwealth,* 260 S.W.3d 805, 814–15 (Ky.2008) (determining that DNA evidence that would "probably" produce a different result was sufficient to warrant a new trial, and need not explicitly exculpate the petitioner); *People v. Jackson,* 91 Mich.App. 636, 283 N.W.2d 648, 650 (1979) (employing standard of whether new testing could make a different result "possible" on retrial); *Brewer v. State,* 819 So.2d 1169, 1173 (Miss.2002) (citation omitted) (stating that standard is whether DNA evidence will "probably produce a different result"); *Commonwealth v. Reese,* 444 Pa.Super. 38, 663 A.2d 206, 209 (1995) (quoting statutory standard that DNA evidence must "have affected the outcome of the trial"); *State v. Hicks,* 202 Wis.2d 150, 549 N.W.2d 435, 439 (1996) (explaining that different result at trial not necessary if the court concludes that the "real controversy" was not fully tried); *In re Bradford,* 140 Wash.App. 124, 165 P.3d 31, 33–34 (2007) (using "will probably change the result of the trial" standard in evaluating DNA evidence).

The State counters that (1) Thompson confessed in open court to having participated in the burglary which resulted in Williar's death; (2) the hair found on Williar's body was matched to Thompson; and (3) "[w]hile it is true the State did acknowledge the possibility of one or more jurors determining that Thompson was the actual rapist, . . . its theory of the case was fundamentally based upon Thompson's role as an accessory—as, indeed, Thompson admitted to being." It concludes that "evidence establishing that he was not the principal rapist does not give rise to a reasonable possibility that the finder of fact would nonetheless have acquitted him." Although the State makes these arguments as if asking us to decide that, even under the correct standard, the postconviction court could not reasonably conclude that Thompson was entitled to a new trial, the State's ultimate request for relief (assuming we have jurisdiction) is a remand "for further consideration under the appropriate standard." While this is the relief that we will grant, we need to address some of Thompson's arguments about how the postconviction court should have treated the DNA evidence, in order to give that court guidance on remand. *See* Md. Rule 8–131(a) ("Ordinarily, the appellate court will not decide any other issue unless it plainly appears by the record to have been raised in or decided by the trial court, but the Court may decide such an issue if necessary or desirable to guide the trial court or to avoid the expense and delay of another appeal.")

This is the first time this Court has reviewed the denial of a new trial based on DNA evidence pursuant to CP Section 8–201. Our CP Section 8–201 postconviction DNA cases up to this point have simply challenged a Circuit Court's refusal to order DNA testing at all. *See, e.g., Simms v. State,* 409 Md. 722, 976 A.2d 1012 (2009); *Gregg v. State,* 409 Md. 698, 976 A.2d 999 (2009); *Thompson v. State,* 395 Md. 240, 909 A.2d 1035 (2006); *Blake v. State,* 395 Md. 213, 909 A.2d 1020 (2006). Therefore we turn to decisions by our sister jurisdictions that have developed modern DNA postconviction jurisprudence.

### The Impact Of Scientific Evidence

From the Supreme Court down, appellate courts have been mindful of the persuasive power of DNA evidence that inculpates or exculpates defendants from criminal activity. Appellate courts have considered such DNA evidence in a postconviction context even when the crime of which the defendant was exculpated was not the same crime that resulted in the challenged conviction. Exculpatory DNA evidence has special impact when the crime was sexual assault. The Supreme Court analyzed this in *House v. Bell*, 547 U.S. 518, 540, 126 S.Ct. 2064, 2079, 165 L.Ed.2d 1 (2006). House was convicted in state court of murder and sentenced to death, based in part on the aggravating factor that the murder was committed in the course of a rape. After filing a habeas petition challenging the evidence used against him at trial, House's conviction was affirmed by the United States Court of Appeals for the Sixth Circuit.

In reversing the Sixth Circuit, the Supreme Court noted that "in direct contradiction of evidence presented at trial, DNA testing ... established that the semen on [the victim's] nightgown and panties came from her husband ... not from House." *Id.* at 540, 126 S.Ct. at 2078–79. The State argued on appeal that the new evidence was immaterial because at the guilt phase, neither sexual contact nor motive were elements of the offense. The Supreme Court disagreed and considered "the new disclosure of central importance." *Id.*, 126 S.Ct. at 2079. Justice Kennedy wrote:

From beginning to end the case is about who committed the crime. When identity is in question, motive is key. The point, indeed, was not lost on the prosecution, for it introduced the evidence and relied on it in the final guilt-phase closing argument. Referring to "evidence at the scene," the prosecutor suggested that House committed, or attempted to commit, some "indignity" on [the victim] that neither she "nor any mother on that road would want to do with Mr. House." Particularly in a case like this where the proof was, as the State Supreme Court observed, circumstantial, we think a jury would have given this evidence great weight.

Quite apart from providing proof of motive, it was the only forensic evidence at the scene that would link House to the murder.

Law and society, as they ought to do, demand accountability when a sexual offense has been committed, so not only did this evidence link House to the crime; it likely was a factor in persuading the jury not to let him go free. At sentencing, moreover, the jury came to the unanimous conclusion, beyond a reasonable doubt, that the murder was committed in the course of a rape or kidnaping. The alleged sexual motivation relates to both those determinations. This is particularly so given that, at the sentencing phase, the jury was advised that House had a previous conviction for sexual assault.

A jury informed that fluids on [the victim's] garments could have come from House might have found that House trekked the nearly two miles to the victim's home and lured her away in order to commit a sexual offense. By contrast a jury acting without the assumption that the semen could have come from House would have found it necessary to establish some different motive, or, if the same motive, an intent far more speculative. When the only direct evidence of sexual assault drops out of the case, so, too, does a central theme in the State's narrative linking House to the crime. In that light, furthermore, House's odd evening walk and his false statements to authorities, while still potentially incriminating, might appear less suspicious.

*Id.* at 540–41, 126 S.Ct. at 2079 (citations omitted). The Supreme Court's analysis is useful in evaluating the impact of Thompson's DNA evidence because it brings home the realities of juror perception when physical evidence implicating rape is present in murder cases. *See also Watkins v. Miller*, 92 F.Supp.2d 824, 838 (S.D.Ind.2000) (rejecting the State's contention that because the defendant was not convicted of rape, DNA evidence that excluded him as the depositor of sperm found on the victim did not prove his innocence with respect to murder because the "argument may be technically correct as an abstract legal proposition, but it is beside the

point in evaluating the significance of the DNA evidence in light of both all the other evidence in the case linking the rape and the murder and the prosecution's use of that evidence").

Exculpatory DNA evidence regarding a sexual assault that was not introduced at the defendant's first trial was also evaluated in a recent Supreme Court of Kentucky case, *Bedingfield v. Commonwealth*, 260 S.W.3d 805 (Ky.2008). In *Bedingfield*, a young female, wearing only a t-shirt, approached two police officers and stated that she had been raped and directed the officers to the residence where she claimed the rape occurred. The police apprehended Bedingfield as he was exiting the residence and the victim identified him as the perpetrator, after which she underwent a post-rape medical examination. Bedingfield introduced postconviction DNA evidence which conclusively excluded him as the source of the semen found in the rape kit. Upon a motion for a new trial, the trial court held that this evidence would not likely change the outcome of the trial with a reasonable certainty.

The Kentucky standard for determining whether a new trial is warranted based upon newly discovered evidence is whether such evidence carries a significance which "would with reasonable certainty, change the verdict or that it would probably change the result if a new trial should be granted." *Bedingfield*, 260 S.W.3d at 809–10. The Supreme Court of Kentucky held that the trial court abused its discretion in denying a new trial because of the "**permeating** and **saturating** effect that the evidence, which was construed to identify Appellant as the source of the semen, played in enhancing the viability and credibility of *all* of the Commonwealth's arguments." *Id.* at 813 (emphasis added, italics in original). The Court also observed:

> [T]he presence of sperm which DNA testing proves did not belong to Appellant does not exonerate him; however, the presence of this new evidence does cast a long shadow and assuredly merits consideration in the form a new trial. **It cannot be overlooked that in Appellant's initial trial, all other arguments were enhanced and corroborated by the supposition that the sperm found belonged to Appellant.**

Indeed, this theme was central to the Commonwealth's prosecution.

*Id.* at 814–15 (emphasis added). The Court granted *Bedingfield* a new trial. Although the new DNA evidence in *Bedingfield* was more directly exculpatory than the new DNA evidence here, because Bedingfield was convicted of rape, we find the Kentucky court's analysis of how the DNA evidence could have affected the jury's assessment of *other* evidence to be helpful. *See also State v. Passino,* 161 Vt. 515, 640 A.2d 547, 552 (1994) ("[D]efendant was considerably prejudiced by preclusion of the exculpatory DNA evidence .... [which] would have rebutted the State's evidence more effectively, or at least would have created doubt regarding defendant's connection to the scene.").

### *The State's Theory Of The Case*
### *In Light Of DNA Evidence*

██ The State's theory here was that both Owens and Thompson raped Williar. The postconviction court found that the DNA evidence "eliminates the possibility that the Petitioner had in fact raped the victim." But the court treated the burglary, the rape, and the murder as if they were separate and unrelated incidents. The three may or may not be intertwined based on the same evidence adduced at trial. The State could be viewed as arguing linkage to the jury, stating that "[t]he people who broke the glass in the basement were the same people who came upstairs, forced themselves on her body on her bed and left the glass while they were doing it." Further, Dr. Smyth linked the rape with the murder by testifying that the age of the sperm found was consistent with having been deposited at or near the time of death. Because the DNA evidence indicated that the sperm was deposited by neither of them, the postconviction court on remand should consider whether this highly persuasive new evidence might have made a difference to the jury as to the rape and its dual service as a predicate felony for the felony murder charge.

The DNA test of the blood on Thompson's pants also conflicts with the prosecution's theory of the case. The State

asserted that the blood on the pants was the same blood type as the victim, and that it was "the blood of Colleen Williar." This evidence provided strong support to the prosecution's theory that Thompson was in Williar's home and had participated in her murder. The DNA testing refuted this claim, and should be considered by the postconviction court on remand.

The State also relied at trial on testimony from the State's criminalist, Mark Profili, that "one of the standard pubic hairs from James Thompson matched one of the hairs found on the victim." The postconviction court considered this evidence important in declining to grant a new trial. In reexamining the new trial issue on remand, the postconviction court should weigh the reliability of hair comparison techniques as compared to DNA testing available now. Profili testified that he performed "comparison microscopic examination" of the pubic hairs. In conducting this comparison, he said, hairs are examined under a comparison microscope that allows them to be examined side-by-side. The hairs are then examined for microscopic properties including, *inter alia,* diameter of the hair, the pigment distribution which gives the hair its color, whether or not a material called medulla is present, holes, damage, and scales. Profili testified that the scientific basis of hair comparison is

> to look at those microscopic properties along the entire length of the hair and to find a region on the hair on one stage that matches the hair on the other stage, and when you have those matching we call that a match. If you can't find that region on the two hairs that match then it does not match.

Profili acknowledged that DNA testing would have provided more accurate results than hair comparison, but said that it was not available to crime laboratories at the time of the trial.

When Profili was asked, "Don't the scientists, the technology existing today, agree [DNA fingerprinting and neutron activation analysis] are more advanced and better forms of hair comparison than simply looking at a microscope[,]" he

responded, "Perhaps DNA[.]" Profili went on to explain the benefits of DNA fingerprinting:

> [Profili]: DNA is the—it is an abbreviation for deoxyribonucleic acid. It is the basis of the genetic code. It is what makes each cell in your body that particular cell and those cells in combination you. DNA makes each individual that individual and it is specific, it is only found in you unless you have an identical twin. It can be found in the bulbs of hair, the roots of hair. It can be found in blood. It can be found in any tissue.

> \* \* \*

> [Thompson's Counsel]: So would it not be correct that if hair is subjected to DNA fingerprinting analysis you could prove positively just like fingerprints prove the uniqueness of that hair unless an identical twin was involved?

> [Profili]: If there is enough DNA material in that particular hair, yes.

There can be little question that DNA analysis provides more accurate results than a microscopic comparison subject only to the discernment of the trained human eye. In a recent comprehensive law review article, Garrett and Neufeld mined the topic of DNA-related exonerations in which defendants had been convicted based upon scientific evidence. Regarding hair analysis, they explained:

> DNA testing of the mitochondria, or when the hair roots are present, of the nucleus, has now supplanted microscopic hair comparison in many cases. In six exonerees' cases, for example, the analyst identified hairs as consistent with the defendant at trial, but mitochondrial or other DNA analysis later determined that those same hairs originated from a person other than the convicted defendant.

Brandon L. Garrett & Peter J. Neufeld, *Invalid Forensic Science Testimony and Wrongful Convictions*, 95 VA. L.REV. 1, 51 (2009).

Profili's expert testimony that the pubic hair found on the victim's body matched Thompson's hair was a key part of the

State's rape case. The older scientific technique compared to the DNA evidence of Thompson's semen that was not introduced is a matter that the postconviction court may consider on remand.

### *Thompson's Confession*

■ Both the State and the postconviction court make much of Thompson's confessions. The State argued:

> By his own confession, his possession of the murder weapon, and his knowledge of details about the crime not known to the general public, it is plain that Thompson was being truthful when he stated that he broke into Williar's house at night intending to steal her possessions. It is unreasonable to determine that the jury would have found him guilty of participating in the break-in and not found him to be an accessory to the ensuing rape, after he confessed to having been an accomplice to the crime.

Thompson, in response, points out that the DNA evidence disproves aspects of his testimony. Specifically, Thompson testified that he witnessed Owens raping the victim and that the blood on his pants came from the victim. As Thompson put it, the DNA evidence refuted both of these "facts."

Even though the postconviction court acknowledged that "there is countless case law where people have confessed to things for which they did not commit or professed their innocence and have DNA evidence exculpate them from the crime they were accused[,]" the court nevertheless appeared to give significant weight to Thompson's confession in denying his motion for a new trial.

Other courts have evaluated confessions in the face of new DNA evidence. One such example is *In re Bradford,* 140 Wash.App. 124, 165 P.3d 31 (2007).[11] Bradford was convicted

---

**11.** *See also Godschalk v. Montgomery County Dist. Attorney's Office,* 177 F.Supp.2d 366, 370 (E.D.Penn.2001) (footnote omitted) (holding that though petitioner offered detailed confessions, there was "a reasonable probability that had DNA evidence which showed [petitioner] was not

of rape and burglary because a jury found "he was the man in a nylon stocking mask who broke into the victim's house and sexually assaulted her." *Id.* at 32. The State's primary evidence against Bradford was a confession which began, " 'I probably did it.' " *Id.* at 32. Like the instant case, Bradford's statement presented reliability problems from the beginning: "his statement varied substantially with the details given by the victim and required consideration of its reliability and weight in light of numerous disagreements between the description and details given by Mr. Bradford and the victim." *Id.*

After DNA testing revealed that Bradford's was not the DNA found on the mask, the State argued that "the evidence of another male's DNA on the side of the tape placed against the mask does not exclude Mr. Bradford as the perpetrator. Thus, it is not evidence that would 'probably change the result of the trial,' when taken with Mr. Bradford's confession." *Id.* at 34. Both the referring judge and the Court of Appeals disagreed and granted Bradford a new trial:

> The most persuasive evidence against Mr. Bradford at trial was his confession. The jury chose to believe the confession, even though the defense at trial attacked its reliability based upon the circumstances in which it was given and its factual inconsistencies with the victim's statement about what happened. Again, the reference judge determined that the jury probably would have decided differently on the issue of the confession's reliability had it known about the DNA evidence.

* * *

The factual disputes regarding Mr. Bradford's confession and alibi, like the other factual disputes noted by the parties, remain open questions for a jury to resolve upon retrial and in the context of the new DNA evidence.

---

the source of the genetic material found on the victims been disclosed to the defense, the result of the proceeding would have been different").

*Id.* at 34–35. The appellate court affirmed the granting of a new trial even though the DNA evidence did "not positively exclude" Bradford, because the new evidence, "if fully accepted by a jury, would probably change the guilty verdict." *Id.* at 31.

DNA evidence is an even stronger factor in favor of a new trial for Thompson on the rape conviction and the felony-murder conviction flowing from that because, unlike *Bradford,* it exculpated him from the rape. It does not, however, exculpate him from the burglary and weapons convictions. The DNA evidence in Thompson's case is not as infused with the evidence supporting the burglary and weapons convictions. Although Thompson's various out-of-court inculpatory statements, i.e., confessions, were all over the lot as to the rape and murder, his statements essentially are consistent with his convictions on the burglary and weapons charges. If, on remand, a new trial were ordered on the rape and felony murder counts, but the burglary conviction left intact, the parties would be free at such new trial to develop further whether the burglary conviction alone satisfies the requirements of serving as a predicate felony for felony murder (should the rape count fall by the wayside).

Further, while scientific tests are obviously important in this case, if Thompson's statements to the investigators included information about the crime scene (e.g. how entry was gained, where the victim's body ended up, etc.) that would be unknown to anyone other than a perpetrator or an eyewitness, the Circuit Court should give appropriate weight to such evidence.

### Conclusion

We vacate the order of the postconviction court and remand for further proceedings consistent herewith. We direct that the lower court, in deciding whether to grant a new trial, utilize the "substantial possibility" standard and consider whether the DNA evidence may have affected the jury's evaluation of the other evidence, including Thompson's confession, all in light of our discussion above.

JUDGMENT OF THE CIRCUIT COURT FOR BALTIMORE CITY VACATED, AND CASE REMANDED FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION. COSTS TO BE PAID BY MAYOR AND CITY COUNSEL FOR BALTIMORE CITY.