66 A.3d 675

**Antonio L. BROWN**

v.

**STATE of Maryland.**

**No. 58, Sept. Term, 2012.**

Court of Appeals of Maryland.

May 20, 2013.

Deborah S. Richardson, Assistant Public Defender, (Paul B. DeWolfe, Public Defender, Baltimore, MD), on brief, for Appellant.

Robert Taylor, Jr., Assistant Attorney General, (Douglas F. Gansler, Attorney General of Maryland, Baltimore, MD), on brief, for Appellee.

Argued before BELL, C.J., HARRELL, BATTAGLIA, GREENE, ADKINS, BARBERA and McDONALD, JJ.

ADKINS, J.

Appellant Antonio Levar Brown is serving the twelfth year of an eighty-five-year sentence for rape, kidnapping, and related charges. He requested, but was denied, a new trial based on what he alleges to be a "favorable" DNA test result. His case reaches us on direct appeal under Section 8–201(k)(6) of the Criminal Procedure Article. We affirm the postconviction court's denial of Brown's motion, holding that—even if the DNA test results could be considered favorable to Brown—the court did not abuse its discretion in finding that there was no substantial possibility that Brown would not have been convicted, had the DNA evidence been presented at trial.

## STATEMENT OF FACTS AND PROCEDURAL HISTORY

The facts underlying the issue before us are not pretty. Brown was charged and convicted for beating and raping Mildred Fleming, who allegedly used to buy drugs from him and owed him $80. The testimony at trial established that, on the night in question, Brown and Fleming ran into each other at the home of a mutual acquaintance, Jacqueline Maize. When Fleming saw Brown, she noticed that his "hand was bleeding" and "asked him what had happened and what was wrong." Brown did not answer, but led Fleming into the bathroom for a chat.

Once there, Brown demanded payment of the money Fleming allegedly owed him. When Fleming was unable to make a payment, Brown punched her in the face, ripped off her shirt, and handcuffed her. After that, Brown and his three cohorts put Fleming in the trunk of a car and drove her to an apartment of another acquaintance, Patty Bruce.

As the Court of Special Appeals summarized the facts in an unpublished 2003 opinion, at Bruce's place, they "beat Fleming with a cane and a broomstick and burned her with a heated

knife, an iron, and a lamp bulb." Brown also "put a broomstick in Fleming's rectum, then removed one of her handcuffs and ordered her to masturbate. He blindfolded her with a shirt . . ., took her to the bathroom, and shoved her head into the toilet." Some time later, Brown "removed the handcuffs, took Fleming to the bedroom and raped her."

When Brown and the other men were done torturing Fleming, they "took her back to Maize's home, this time, in the passenger compartment of the car." Fleming said nothing "about the incident" to Maize and "got high on crack cocaine." Fleming testified at trial that "she did not call the police or go to the hospital because she knew there was a warrant for [her] arrest for a probation violation." About one week after the incident, however, Fleming did talk to the police. "She showed them the burn marks and was taken to the hospital for treatment. Detective Sergeant Misty Saunders, who took Fleming to the hospital, testified that Fleming had 'soft scabs.' She took photographs, which were shown to the jury."

At the trial, Maize "confirmed Fleming's testimony that Fleming was taken into the bathroom and that she was handcuffed when she was brought out." She testified that Brown, "Fleming, and the others left around 5:00 a.m., and returned sometime later. Fleming was upset and crying, and seemed scared."

Bruce also testified at Brown's trial. She told the jury that "she was drunk when appellant and his companions showed up at her home with Fleming. She recalled that Fleming looked 'like herself,' except that her hands were crossed and her shirt was hanging over her shoulder." High on "Percocets and crack," Bruce "was 'in and out of it' when the group went into the bedroom," but "[a]fter they left, she found her bedroom lamp broken and burning. Later, she discovered a burned and bent butter knife on the stove. She threw the knife away."

Another witness, Dorothea Wars, testified that Fleming came to her house after the rape and showed her body, allowing the witness to see "everything that happened." Wars

"also described a telephone call from [Brown], in which he asked if she knew what Fleming was saying. When Wars recounted what Fleming had said about the incident, [Brown] first denied, then admitted, his participation. He asked Wars to tell Fleming that he was sorry and to convey the message that he would 'give her anything she wanted' if she dropped the charges."

The father of Fleming's child, Walter Groomes, then testified and "described Fleming's appearance when he arrived at Maize's residence the evening following the rape. He testified that Fleming's face and mouth were bruised, cut and swollen, her clothes were raggedy, and she had burn marks on the back and inside of her thigh."

Brown himself stated to the police "that Fleming owed him money for drugs. He stated that he met her at Maize's home and drove her to Bruce's apartment, but that she rode in the car and not in the trunk. He admitted hitting her with his fist 'a couple times,' but denied raping her."

There was no physical evidence tying Brown to the crimes. None of Brown's blood or hair was found at the crime scene or any of the objects used in the attack of Fleming, including the broomstick. Brown's counsel emphasized this point at trial, eliciting testimony that the broomstick had been tested for blood and hair, but "all of it came back negative." There was testimony at trial that some fibers, which were found on the bristles of the broomstick with which Fleming was sodomized, were still to be tested for DNA. But Brown's attorney stressed that the fibers were on the bristles only and—other than those fibers—everything else was tested and "everything else came back negative."

Despite Brown's counsel's efforts to establish the lack of physical evidence tying Brown to the crimes, Brown was convicted of first degree rape and related charges on September 27, 2001 after a four-day trial in the Circuit Court for Carroll County. He was also unsuccessful in appealing his convictions.

On June 6, 2009, Brown filed a petition for postconviction DNA testing. His initial request was denied,[1] but on July 8, 2010, the Circuit Court heard argument on a Revised Petition for Post–Conviction DNA Testing, in which Brown asked to test for the absence of Fleming's DNA on the broom and the knives used during the attack. Brown argued that Fleming lied and "if the events occurred as she claimed, then testing [would] find her DNA." In other words, Brown sought "to attack [Fleming's] credibility by showing that her DNA is not on [those] items." On September 29, 2010, the Circuit Court granted Brown's motion.

The DNA testing produced two types of results with respect to the broomstick. First, the testing indicated the presence of DNA consistent with Fleming's on the top three inches and somewhere around the mid-section of the broomstick. Second, the testing showed that Brown's DNA was not on the broomstick.[2] Brown interpreted these results as "favorable" to his case, and on May 2, 2011, filed a Motion for Relief under Section 8–201 of the Criminal Procedure Article, requesting a new trial. On April 30, 2012, the postconviction court denied the motion, having found that no "substantial possibility exists that the Petitioner would not have been convicted had the DNA testing been introduced at trial or that ordering a new trial is in the interests of justice." The court also added that "the testing results are unfavorable to the Petitioner" because

---

1. Brown appealed to this Court and on February 3, 2010, we granted a joint motion, filed by Brown and the State, to remand the case to the Circuit Court for further proceedings.

2. It is not entirely clear from the DNA expert's report whether she tested the bristles or just the handle of the broomstick for the presence of DNA. In the report itself, the expert refers to testing five sections of the "broom stick," including the "remainder of broom stick (inch 27 to bristle end)," but in the cover letter accompanying the report, she explains that she "performed DNA testing in five sections along the entire *stick of the broom.*" (Emphasis added.) The postconviction court understood the test to cover the entire broom "through the bristles." In any event, the parties do not make the distinction between the handle and the bristles in their briefs, referring instead to the "broomstick."

he "argued that the testing would fail to find the victim's DNA, but the results could not exclude her."

Brown noted a direct appeal to this Court under Section 8-201(k)(6) of the Criminal Procedure Article. He presented the following questions for our review:

1. Did the lower court err in finding that the DNA test results were unfavorable to Mr. Brown?

2. Did the lower court err in finding that there was not a substantial possibility that Mr. Brown would not have been convicted had the DNA test results been introduced at trial?

3. Did the lower court err in refusing to order a new trial in the interests of justice? [3]

We hold that—even if the absence of Brown's DNA on the broomstick could be considered "favorable" evidence [4]—there is no substantial possibility that he would not have been convicted had that evidence been introduced at trial.

## DISCUSSION

■ Brown seeks a new trial under the DNA postconviction statute, codified as Md.Code (2001, 2008 Repl.Vol., 2012 Cum.

---

3. This reference to ordering a new trial in the interests of justice is the only time Brown mentions the interests of justice as the grounds for a new trial in his brief. Under Section 8–201(i)(3), even if the court finds that a substantial possibility of a different outcome does not exist, "the court may order a new trial if the court determines that the action is in the interest of justice." Md.Code (2001, 2008 Repl.Vol., 2012 Cum. Supp.), § 8–201(i)(3) of the Criminal Procedure Article. At oral argument, Brown argued that a new trial would be in the interests of justice in this case because the DNA expert opined that the DNA evidence in this case is inconsistent with the State's theory of the case. As we discuss below, we find the DNA expert's opinion on this issue unconvincing. Brown offered no other reason for why this case would require us to hold that the postconviction court abused its discretion in denying Brown's motion for a new trial.

4. There can be little doubt that the other piece of DNA evidence—the two DNA profiles from which Fleming could not be excluded as a possible contributor—could not be considered "favorable" by any stretch of the imagination, even using Brown's hypothetical that Fleming's DNA was on the broomstick, which was found outside of Bruce's apartment, because Fleming "used it to sweep snow, not because she was sodomized with it."

Supp.), § 8–201 of the Criminal Procedure Article ("CP"). Under the statute, a new trial is available as a remedy, but only when (1) "the results of the postconviction DNA testing are favorable to the petitioner," and (2) there is "a substantial possibility . . . that the petitioner would not have been convicted if the DNA testing results had been known or introduced at trial." *Id.* § 8–201(i)(2)(iii). If, however, "the results of the postconviction DNA testing are unfavorable to the petitioner, the court shall dismiss the petition." *Id.* § 8–201(i)(1).

 A postconviction court's rulings under CP § 8–201 are subject to direct review by this Court. CP § 8–201(k)(6). Because a decision on "whether to grant a new trial is within the discretion of the trial court," *Arrington v. State,* 411 Md. 524, 551, 983 A.2d 1071, 1087 (2009) (quoting *Cooley v. State,* 385 Md. 165, 175, 867 A.2d 1065, 1071 (2005)) (quotation marks omitted), we review denials of a new trial under CP § 8–201(i)(2)(iii) for abuse of discretion. The postconviction court's factual findings are also subject to a deferential standard of review and will not be disturbed unless there is clear error. *Id.,* 983 A.2d at 1086–87.

Brown seeks a new trial, arguing that "[t]he DNA test results were inconsistent with the State's theory of the case." [5]

---

**5.** Here, Brown assigns much weight to the opinion of the DNA expert who performed the postconviction DNA testing. In an affidavit, submitted as an exhibit to Brown's motion for a new trial, the expert opined that neither (1) the presence of a DNA profile from which Fleming could not be excluded nor (2) the absence of Brown's DNA were consistent with the State's theory of the case:

Fleming cannot be excluded as a possible contributor of the DNA obtained from . . . two sections of the broomstick. . . . However, in my expert opinion, the DNA test results . . . obtained are inconsistent with Ms. Fleming's description of the assault she was subjected to by Petitioner with the use of the broomstick. Furthermore, if the alleged assault took place as described by Ms. Fleming, it is my expert opinion that DNA from the suspect would also have been recovered from the broom stick. According to the testimony of Ms. Fleming, she indicated that Mr. Brown was bleeding from his hand prior to the alleged assault. Because blood is a good source of DNA, I would expect that if Mr. Brown handled the stick with a recently bloodied hand, I would have detected his DNA on the stick.

He sees a mismatch between Fleming's testimony that his hand was bleeding right before he allegedly sodomized her with a broomstick and the lack of his DNA on the broomstick.[6] Brown is confident that his DNA would have been on the broomstick, if the "events really took place as Fleming claims." As a result, Brown believes that the DNA test results show that Fleming was untruthful in her testimony, and that there is a substantial possibility that he would not have been convicted if the DNA test results would have been introduced at trial.

The State disagrees. In its opinion, the DNA test results were not favorable and there was no substantial possibility that Brown would not have been convicted. With respect to the favorability prong, the State points out that the fact that Brown's DNA was not on the broomstick is not new evidence: "Brown was aware at trial of the absence of affirmative forensic evidence that he bled on the broomstick. The jury

---

But the DNA expert's opinion—that the location of the DNA on the broomstick was not consistent with sodomy—is outside the field of expertise of such an expert. *See Hartless v. State*, 327 Md. 558, 573, 611 A.2d 581, 588 (1992) (an expert may only testify to subjects within his area of expertise). As for the expert's opinion that, "[b]ecause blood is a good source of DNA, ... if Mr. Brown handled the stick with a recently bloodied hand, I would have detected his DNA on the stick," we explain below that the this assertion does not add anything new to the evidence the jury had before it when it convicted Brown. The jury knew that Brown's hand was bleeding, that he used the broomstick to sodomize Fleming, that there was no blood (or hair) on the broomstick, and yet, the jury convicted Brown.

6. Brown also mentions in his brief the other DNA test results, which established that Fleming could not be excluded from the two DNA profiles found on the broomstick. It is not entirely clear from Brown's arguments if he considers these test results to be "favorable" or if he only makes that claim with respect to the absence of his DNA. At one time, he posits: there is a "possibility that Fleming's DNA was found on the broom because she used it to sweep snow, not because she was sodomized with it. Indeed the location of the DNA on the broom, on the top three inches and then again between inches fifteen and twenty-seven is consistent with Fleming having used the broomstick to sweep snow." But that evidence would also be consistent with Fleming having been sodomized with the broomstick. Like the postconviction court, we do not see how one could characterize these DNA test results as "favorable" to Brown.

also was made aware of it." Indeed, in his Petition for DNA Testing, Brown "noted that the items were tested for blood with negative results." Furthermore, the State argues that "[e]ven if the absence of blood on the broomstick constituted newly discovered evidence ... it cannot be considered 'favorable' because it is not exculpatory." According to the State, regardless of whether Brown "actually handle[d] the broomstick, it in no way absolves him of his liability as [an] accomplice in that particular sexual assault." In any event, the State maintains that, even if the DNA test results could be considered "favorable,"[7] there was no substantial possibility that the trial would have reached a different outcome, had these DNA test results been introduced.

In making these competing arguments, the parties rely on *Thompson v. State,* 411 Md. 664, 985 A.2d 32 (2009) and *Arrington v. State,* 411 Md. 524, 983 A.2d 1071 (2009), two cases in which we considered whether there was a substantial possibility that the defendant would not have been convicted, had the newly-discovered DNA evidence been presented at trial.

At Thompson's trial for "rape, burglary, felony murder and a weapons offense," the State argued to the jury that the sperm recovered during the victim's autopsy "came from the rapist" and that "the blood found on Thompson's jeans was the same blood type [as the victim's]."[8] *Thompson,* 411 Md. at

---

**7.** The State also emphasizes that, when Brown requested postconviction DNA testing, he maintained that the testing would produce a different kind of a "favorable" result. Namely, he contended that the testing would show that Fleming's DNA was not on the broomstick. The results showed quite the opposite: DNA profile from which Fleming could not be excluded was found in two areas of the broomstick, one of which was consistent with sodomy. According to the State, "[w]hen the test results are directly contrary to what the petitioner initially defines as 'favorable,' it undermines the basis for ordering the testing to begin with, let alone any subsequent demand for a new trial." We do not need to reach this argument because our holding rests on Brown's failure to satisfy the substantial probability prong.

**8.** The State also "linked this with testimony that blood of an unspecified type was found on the murder weapon." *Thompson v. State,* 411 Md. 664, 670–71, 985 A.2d 32, 35–36 (2009).

670–71, 985 A.2d at 35–36. After the trial, however, DNA testing "excluded both [Thompson's co-defendant] and Thompson as depositors of the sperm," and "the testing on Thompson's blue jeans at the location of the bloodstain showed that the blood did not come from the victim." *Id.* at 672–73, 985 A.2d at 37. Although the DNA testing conclusively established that Thompson did not rape the victim, the postconviction court denied the motion for a new trial because "the DNA evidence did not remove Thompson from the scene of the crime and thus could not exculpate him on a felony murder charge." *Id.* at 674, 985 A.2d at 38. We vacated that order and remanded with directions that the postconviction court "consider whether this highly persuasive new evidence might have made a difference to the jury as to the rape and its dual service as a predicate felony for the felony murder charge." *Id.* at 689, 985 A.2d at 47.

*Arrington* also involved the State's reliance on blood evidence, which later proved to be incorrect. Arrington was convicted of second degree murder, in part, based on the testimony that blood of the same type as the victim's was found on his sweat pants. *Arrington,* 411 Md. at 529, 983 A.2d at 1072. Postconviction DNA testing "conclusively proved," however, that the blood was not the victim's. *Id.* at 534, 983 A.2d at 1076. Emphasizing the jury's specific questions about the blood stains and the State's express reference to the stains and the matching blood type, we held that there was a substantial possibility that the outcome at trial would have been different, had the evidence been presented at trial. *Id.* at 553–56, 411 A.2d at 1088–89.

Brown analogizes this case to *Thompson* and *Arrington,* arguing that, as in those two cases, the DNA test results here "showed the absence of [his] DNA," and "were inconsistent with the State's theory of the case." The State counters that Brown's reliance on *Thompson* and *Arrington* is misplaced. Unlike in *Thompson*—where the State suggested that the semen found in the victim's vagina was Thompson's (or at least his accomplice's) and the blood on Thompson's pants was the victim's—and unlike in *Arrington*—where the State ar-

gued that the blood on Arrington's sweat pants was the same type as the victim's—here, the State never made similar allegations about the evidence. As the postconviction court properly emphasized, "the State never presented the jury with evidence that Petitioner's DNA was on the broom."

Indeed, quite the opposite from *Thompson* and *Arrington* happened at Brown's trial. Not only was the jury **not** led to believe that there was forensic evidence linking Brown to the crime, but it was specifically told that there was no such forensic evidence. Through Fleming's testimony, the jury knew that Brown's hand was bleeding on the night in question, and Brown's counsel emphasized in his opening statement that there was no physical evidence linking Brown to the crimes. He told the jury: the police "retrieved items from the apartment [and] submitted those items to be tested for the presence of any evidence to corroborate what Ms. Fleming said. Guess what? The test came back negative."

He pursued the same theory of defense through the questioning of Detective Hundermark, stressing the absence of Brown's blood and hair on the broomstick:

[MR WARREN]: . . . And, the reason that you requested a search and seizure warrant to seize this physical evidence [from Bruce's home] is because you felt that there may be something there that will corroborate what—some physical evidence there to corroborate what Ms. Fleming was saying.

[DETECTIVE HUNDERMARK]: That, and also based on Ms. Fleming's explanation of what was utilized on her when she was tortured was an additional reason. Obviously, . . .

\* \* \*

Q: And, in fact, that's why you submitted the items to the lab for comparison.

A: Correct.

Q: Did you receive any positive results from the items that you submitted?

A: No, sir.

Q: You submitted the items for blood and hair. Is that correct?

A: Blood, hair and fibers, yes, sir.

Q: Blood, hair and fibers? And, all of it came back negative. Is that correct?

A: Correct ... [9]

---

9. Detective Hundermark also testified that some fibers were found on the bristles of the broomstick, which remained to be tested for DNA at the time of Brown's trial. But Brown's counsel clarified that the fibers were in the bristles only and that the test results were negative for blood and hair:

> Q: Let me show you what's been marked as State's Exhibit 4A for identification only and ask you if that's the result—the results that you got back from Ms. Stone of the Maryland State Police?
> A: That's correct.
> Q: Review the document, and correct me if I'm wrong, the fibers that came back, came back from the bristles of a broom, is that correct, not the handle?
> A: That's what the document states.
> Q: Okay. Thank you, Detective.
> A: Sure.
> Q: So, with the exception of what came back in bristles, everything else came back negative. Is that fair to say?
> A: Well, I don't know because my understanding was that it was a sample taken from the broom handle. I don't know if I misunderstood Ms. Stone.
>
> \* \* \*
>
> Q: But, you didn't find any—or the results that came back, with the exclusion of fibers that we talked about where they were recovered as still—will be cleared up—but, with the exclusion of those fibers, nothing came back.
> A: Correct.

Even if we were to entertain the possibility that Brown handled the broomstick by the bristles—thereby leaving the door open for the jury to think that the untested fibers found on the bristles were somehow linked to Brown—the State never argued that connection. In *Arrington* and *Thompson,* it was the State's reliance on the faulty evidence that convinced us that there was a substantial possibility of a different outcome at trial. Without the State's reliance on the fibers in the bristles here, the possibility of a different outcome at trial—even with this new evidence—is much less likely. Furthermore, Brown does not even mention the bristles in his brief or at oral argument. His entire argument rests on Fleming's statement that his hand was bleeding but his DNA is not on the broomstick. Even at trial, however, there was

Thus, this case is not like *Thompson* or *Arrington*. As the State points out, "the DNA test results did not contradict or undercut any information presented to the jury at trial." Unlike *Thompson* and *Arrington*, "Brown could, and did, make the identical argument to the jury in 2001 that he now claims the DNA evidence allows: there is no forensic evidence linking him to the broomstick."

Even in the absence of forensic evidence, however, there was evidence the jury found convincing. There was testimony at trial that Fleming was assaulted by Brown and another man in different locations over the course of four-and-a-half to five hours. These assaults began at Maize's apartment with Brown punching Fleming in the face and chest, ripping of her shirt, handcuffing her, and shoving her in the trunk of a car. The assaults continued in Bruce's apartment, where Brown handcuffed Fleming to a loveseat, burned her with a knife, beat her with a wooden cane, shoved her head into a toilet, sodomized her with a broomstick, made her masturbate, and raped her. There was other evidence corroborating the circumstances surrounding these crimes, including the testimony of Maize, Bruce, and Groomes, as well as the photographs of Fleming's injuries taken by the police, Brown's admission of guilt to Wars, and Brown's statements to the police.

In light of this evidence, the postconviction court did not abuse its discretion in finding that the absence of Brown's DNA on the broomstick did not provide a substantial possibility that the jury would have reached a different conclusion with respect to Brown's guilt.[10] Moreover, the jury already knew Brown's hand was bleeding on the night of the assault, but yet, no blood was found on the broomstick. The absence of

evidence that the broomstick—and presumably the bristles—tested negative for blood.

**10.** This holding makes it unnecessary for us to resolve the arguments raised by the State that (1) in order to be a "favorable" result under the DNA statute, the actual test results must be consistent with the basis given for ordering the postconviction DNA testing; and (2) the results must be exculpatory, as opposed to merely impeaching a witness's credibility, in order to grant a new trial.

Brown's DNA did not create a substantial possibility of a different outcome at trial.

## Conclusion

Postconviction DNA testing in this case established that Brown's DNA was not on the broomstick used to sodomize the victim. But, unlike in *Thompson* and *Arrington,* the State never suggested that there was physical evidence linking Brown to the crime generally, or the broomstick in particular. On the contrary, the jury heard the victim testify that Brown's hand was bleeding and knew from expert testimony that his blood was not on the broomstick. The postconviction court did not abuse its discretion in ruling that the absence of Brown's DNA did not provide a substantial possibility that Brown would not have been found guilty if the DNA evidence had been introduced at trial. The jury convicted Brown after a four-day trial, having been told time and again by Brown's counsel that there was no physical evidence linking Brown to the crimes. Thus, we affirm the court's denial of Brown's motion for a new trial.

**JUDGMENT OF THE CIRCUIT COURT FOR CARROLL COUNTY AFFIRMED; COSTS IN THIS COURT TO BE PAID BY APPELLANT.**