*Travis Rashad Shepperson v. State of Maryland*, No. 36, September Term, 2024, Opinion by Killough, J.

**MD. CODE ANN., CRIM. PROC. § 8-201 – DNA APPEALS – ABUSE OF DISCRETION – NO DETECTABLE DNA RESULTS**

Maryland Code Criminal Procedure Article ("CP") § 8-201(b)(1) provides that an eligible person convicted of a crime of violence may file a petition for postconviction DNA testing of evidence possessed by the State that is related to the judgment of conviction. A petitioner may file a motion for a new trial based on such DNA testing. Under CP § 8-201(i), the postconviction court shall dismiss a motion for a new trial if the DNA results are unfavorable. If the results of the DNA testing are favorable, the petitioner may move for a new trial. Under CP § 8-201(i), the postconviction court may grant a new trial if it finds that: (1) a substantial possibility exists that the petitioner would not have been convicted if the DNA testing results had been known or introduced at trial, or (2) a new trial is in the interest of justice.

Shepperson was convicted of first- and second-degree sexual offenses, use of a handgun in the commission of a crime of violence, robbery with a dangerous weapon, robbery, and theft. One piece of evidence introduced at the 2009 trial was a DNA result showing the presence of the victim's DNA on the barrel of a gun found in his possession ("Gun Barrel Sample"). DNA testing conducted 16 years later on a different portion of the Gun Barrel Sample pursuant to CP § 8-201 detected no DNA and was not processed further because the sample was below the threshold for analysis. The postconviction court did not abuse its discretion in denying Shepperson's motion for a new trial based on the new test results. The postconviction court found that the 2024 Bode Technology test result did not contradict the earlier DNA profile introduced at trial, nor did it undermine the State's theory of the case. Moreover, the new result pertained to an act for which Shepperson was acquitted and bore no connection to the sex offenses for which he was convicted. Accordingly, the new DNA result did not create a substantial possibility of a different verdict and did not warrant a new trial in the interest of justice.

Circuit Court for Prince George's County
Case No.: CT080924X
Argued: May 5, 2025

IN THE SUPREME COURT

OF MARYLAND

No. 36

September Term, 2024

TRAVIS RASHAD SHEPPERSON

v.

STATE OF MARYLAND

Fader, C.J.,
Watts,
Booth,
Biran,
Gould,
Eaves,
Killough,

JJ.

Opinion by Killough, J.

Filed: July 24, 2025

Pursuant to the Maryland Uniform Electronic Legal
Materials Act (§§ 10-1601 et seq. of the State
Government Article) this document is authentic.



Gregory Hilton, Clerk

This case involves the denial of Petitioner Travis Rashad Shepperson's motion for a new trial by the Circuit Court for Prince George's County. Shepperson sought relief under Maryland Code Ann., Criminal Procedure Article ("CP") § 8-201, following postconviction DNA testing of evidence used at his 2009 trial. At trial, one piece of evidence introduced by the State was a DNA result showing the presence of the victim N.M.'s DNA on the barrel of a gun found in his possession. At the conclusion of the trial, Shepperson was convicted of first- and second-degree sexual offenses, use of a handgun in the commission of a felony, and other robbery-related charges. The trial judge merged the convictions for the second-degree sex offense and robbery into their respective greater offenses. Shepperson was sentenced to life for the first-degree sex offense, a consecutive 20-year sentence for the use of a handgun conviction, and a consecutive 20-year sentence for the robbery with a deadly weapon conviction.

In a postconviction proceeding in 2023, Shepperson sought DNA testing of a residual swab from the barrel of the handgun used during the attack on N.M. The test "results were below the limit of detection and, therefore not processed further." In his postconviction motion for a new trial, Shepperson argued that the absence of detectable DNA on the 2024 test conducted by Bode Technology[1] was favorable as it contradicted the 2008 test conducted by BRT Laboratories[2] and created a substantial possibility of a

---

[1] Bode Technology is an independent accredited laboratory that the Prince George's County Police Department works with to conduct forensic testing.

[2] BRT Laboratories was an independent accredited laboratory that the Prince George's County Police Department worked with to conduct forensic testing.

different outcome. The postconviction court denied Shepperson's motion for a new trial, finding that the new DNA evidence did not refute the N.M.'s testimony or the State's evidence adduced at trial.

We agree with the postconviction court and affirm its judgment. The jury convicted Shepperson of first-degree sex offense based on N.M.'s testimony that he forced her to perform fellatio on him at gunpoint. The forensic and non-forensic evidence presented at trial overwhelmingly identified Shepperson as the person in possession of the gun allegedly used in the assault. The postconviction court did not abuse its discretion in concluding that the absence of detectable DNA on a previously untested portion of the gun barrel swab does not materially undermine the evidence presented at trial. As discussed below, the "no detectable DNA" finding related to the rape offense for which Shepperson was acquitted and had no bearing on the charge related to the forced fellatio—the sole sexual offense for which he was convicted. Thus, the new DNA result neither contradicts the State's theory of the case nor creates a substantial possibility that the jury would have reached a different verdict. Under these facts, the new DNA results prove nothing and do not warrant relief. *Cf. Diggs & Allen v. State*, 213 Md. App. 28, 66–67 (2013), *aff'd sub nom. Allen v. State*, 440 Md. 643 (2014) (inconclusive DNA results that prove nothing do not warrant relief).

**I.**

*The Assault*

The events giving rise to this DNA appeal occurred on May 5, 2008, in Landover, Maryland.

2

On May 5, 2008, N.M. was working as a sales representative at a wireless communications store in Landover, Maryland. N.M. arrived at work at 10:00 a.m. and sat behind the counter waiting for customers. About 20 minutes after the store opened, a masked assailant later identified as Shepperson entered the store, pointed a silver revolver with a black handle at N.M., and demanded money. N.M. advised that there was no money in the cash register but offered to give him $100 of her own money and to activate some phones for him. The assailant took N.M.'s money but was adamant that there was money in the backroom. He then ordered N.M. to the back, where she showed him the safe that contained phones but no money.

After realizing that there was no money in the safe in the backroom, the assailant demanded sex from N.M. At trial, N.M. testified that he forced her to perform fellatio on him at gunpoint and then, despite N.M.'s false claim that she had chlamydia, forced her to engage in vaginal and anal intercourse, threatening her life and continuing to point the gun at her, opening the gun to display the bullets. N.M. described the bullets in the gun as one gold and the rest silver to the investigating officers. At trial, N.M. testified that the assailant wore a condom during the assault. N.M. also testified that during the vaginal rape, he stuck "the gun in [her] mouth" and forced her to suck on the barrel of the gun.

N.M. testified that the assailant stopped sexually assaulting her when he saw a customer enter the store on the video monitor in the backroom. When the assailant went to speak with the customer, N.M. ran into the bathroom and locked the door. After the customer left the store, the assailant returned to the backroom and threatened N.M., saying

3

that she had better come out of the bathroom, or he would take her car. N.M. remained in the bathroom until he left the store.

When the assailant left the store, N.M. grabbed her purse and noticed her phone was missing. N.M. then ran next door to another store to call the police. When speaking with the 911 dispatcher, N.M. did not inform the dispatcher that she had been raped, only that there was a robbery. At trial, N.M. testified that she did not inform the 911 dispatcher that she had been raped because there were several elderly women around and she did not want to disclose in front of them that she had been raped.

When officers from the Prince George's County Police Department arrived, N.M. described the assailant as a six-foot-tall black male weighing 160 pounds with droopy brown eyes. N.M. informed officers that he was wearing a black mask, black North Face jacket, blue jeans, and blue and gray New Balance sneakers. N.M. notified officers that he may have taken her cellphone, a brown Motorola Sidekick. N.M. also disclosed to a female officer that the assailant had raped her.

After being transported to the police station, N.M. was taken to Prince George's Hospital Center for a sexual assault forensic examination. The examination was conducted by a physician, with the hospital's custodian of records present. During the examination, N.M. described the assault, including acts of fellatio, vaginal intercourse, and anal intercourse. Swabs and a blood sample were collected from N.M., placed into separate envelopes, and sealed.

At trial, N.M. testified that she disclosed during the examination that the assailant had forced his gun in her mouth. However, that disclosure was not documented in the

4

medical records.  The day following the incident, N.M. returned to the police station to provide a written statement, which did not include any reference to a gun being placed in her mouth.  During trial testimony, N.M. stated that the barrel of the gun was inserted into her mouth during vaginal intercourse.

On the day of the assault, officers tracked N.M.'s cellphone to the District Court Office of Parole and Probation in Hyattsville, Maryland.  The officers located, arrested, and transported to the station a man, later identified as Shepperson, who matched the description provided by N.M.—wearing the same clothing and in possession of her cellphone.  Pursuant to a search warrant executed at a residence associated with Shepperson, officers recovered a silver revolver from a dresser drawer.  N.M. later identified the gun as the one used during the assault and recognized the combination of four silver bullets and one gold bullet.

*The Trial*

The matter proceeded to trial before the Circuit Court for Prince George's County from March 17 to 20, 2009, on seven counts: (1) first-degree rape, Md. Code Ann., Crim. Law ("CL") § 3-303; (2) first-degree sexual offense, CL § 3-305; (3) second-degree sexual offense, CL § 3-306; (4) sodomy; (5) use of a handgun in the commission of a crime of violence, CL § 4-204(a); (6) robbery with a dangerous weapon, CL § 3-403; and (7) robbery, CL § 3-402.  The first-degree rape charge related to the vaginal intercourse allegation, the sexual offense charges related to the fellatio allegation, and the sodomy charge related to the anal intercourse allegation.

5

During the four-day trial, the State presented both forensic and physical evidence. Jessica Charak, a forensic chemist and senior DNA analyst with the Prince George's County Police Department, cataloged the evidence and screened several items for the presence of blood and semen. Blood was detected on the vaginal and anal swabs but not on the oral swabs. All three swabs tested negative for semen.

Charak received "two swabs that were recovered from the cylinder release button, the trigger, and the grips of" Shepperson's gun. Charak saw no reason to conduct serology testing on these swabs and "repackaged the swab and sent it to BRT Laboratories for DNA analysis."

In November 2008, a Prince George's County police officer swabbed the barrel of the revolver recovered during the investigation. That swab was introduced at trial as State's Exhibit 25 (hereinafter, the "Gun Barrel Sample"). Upon receipt, Charak immediately forwarded the sample to BRT Laboratories for DNA analysis without opening it to ensure timely processing before trial.

Alison Shao, a forensic DNA analyst employed by BRT Laboratories, received multiple items for testing, including reference samples from N.M. and Shepperson, as well as swabs collected from the gun. Shao testified that she analyzed the Gun Barrel Sample by removing a small cutting from the swab, leaving more than half of the swab intact for potential future testing, and then processed the sample for DNA. Shao was able to generate a DNA profile consistent with N.M. being the major contributor.

On cross-examination, Shao testified that she also tested a sample from the grip of the gun (hereinafter "Gun Grip Sample"), taken from the cylinder release, trigger, and grips

6

of the gun. That analysis revealed a mixed DNA profile from more than one contributor. N.M.'s DNA profile was consistent with that of the major contributor, and Shepperson's profile matched eight of the nine loci[3] tested.

The jury ultimately convicted Shepperson of first- and second-degree sexual offense, both of which related to the fellatio allegations; use of a handgun in the commission of a crime of violence; robbery with a dangerous weapon; robbery; and theft. Shepperson was acquitted of the rape and sodomy charges, which related to the vaginal and anal intercourse allegations, respectively. The trial judge sentenced Shepperson to life imprisonment for first-degree sexual offense, followed by a consecutive 20-year sentence for the handgun offense, and a consecutive 20-year sentence for robbery, merging the remaining convictions.

The Appellate Court of Maryland affirmed the convictions in *Shepperson v. State*, No. 714, September Term, 2009 (filed Jan. 11, 2012), and a petition for a writ of *certiorari* to this Court was denied on May 14, 2012. *Shepperson v. State*, 426 Md. 429 (2012).

---

[3] "A locus (or loci, plural), is the actual location of the gene on a region of a chromosome." National Institute of Justice, Principles of Forensic DNA for Officers of the Court, Locus and Allele, *available at*, https://perma.cc/6BAY-KXVM.

*Postconviction Proceedings*

On February 17, 2023, Shepperson filed a Petition for Postconviction DNA Testing to test the Gun Barrel Sample. The State consented to additional testing, and the postconviction court ordered the testing of the Gun Barrel Sample on November 21, 2023.[4]

After the DNA testing results were completed, Shepperson filed a motion for a new trial, asserting that the DNA results from the Gun Barrel Sample were favorable to his defense. Shepperson raised two primary arguments: (1) that had the jury known independent DNA testing of the gun barrel revealed no detectable DNA, there was a substantial possibility that he would not have been convicted; and (2) that if the jury had been aware of the discrepancy between the 2024 Bode Technology test (indicating no DNA) and the State's theory—that Shepperson forced the victim to perform a sexual act using a gun—a substantial possibility existed that the trial outcome would have changed.

---

[4] Although the State consented to the Petition for Postconviction DNA Testing, the postconviction court remains the statutory gatekeeper under CP § 8-201(d) and is not obligated to authorize testing merely because the parties agree. Here, it appears that all parties were operating under a mistaken assumption concerning the evidence adduced at trial. At best, the new test could have confirmed the original result, shown that N.M.'s DNA was not present, or—as ultimately occurred—yielded no detectable DNA. As we explain below, none of these results would create a reasonable probability that the DNA testing would reveal exculpatory or mitigating evidence let alone rise to the substantial possibility standard required to grant a new trial under CP § 8-201(i), as the barrel-in-mouth incident was related to a charge for which Shepperson was acquitted, first-degree rape. However, the parties and postconviction court appear to have believed that the barrel-in-mouth incident was related to the fellatio-related sexual assault charges of which Shepperson was convicted.

A hearing on the motion was held on November 6, 2024. During the hearing, Shepperson's DNA expert testified that "[t]he [Gun Barrel] [S]ample was screened for human DNA and the results were below the limit of detection and, therefore, not processed further."

Following the hearing, the postconviction court issued a written memorandum opinion denying the motion. The postconviction court held that there was not a substantial possibility that Shepperson would not have been convicted had the jury at the 2009 trial known that independent DNA testing of the Gun Barrel Sample was inconclusive. The court relied on *Diggs & Allen*,[5] holding that "an inconclusive test is evidence of nothing, and it could not prejudicially affect the fairness of the [Petitioner's] trial." The court further found that "even if the jury knew about the mismatch between the [2024] Bode Technology report of inconclusive DNA and the State's theory that Petitioner put a pistol in [N.M.]'s mouth to force her to perform a sexual act, there is not a substantial possibility that a different outcome exists." The postconviction court reasoned that "the report does not refute the victim's testimony and evidence adduced at trial." That evidence included N.M.'s description of the silver .38 Smith & Wesson revolver allegedly used, which was

---

[5] Although the Appellate Court in *Diggs & Allen* described an inconclusive DNA result—one that neither includes nor excludes a person—as "evidence of nothing," that principle applies only by analogy here. *See Diggs & Allen v. State*, 213 Md. App. 28, 66–67 (2013). The DNA result at issue in this case involved no detectable DNA due to insufficient material for analysis, not an inconclusive interpretation of an existing profile. In some contexts, a "no detectable DNA" finding might cast doubt on earlier results. But as explained below, that is not the case here. Thus, while *Diggs & Allen* may offer a helpful framework for evaluating postconviction DNA results, it does not control the outcome in this case.

later recovered from Shepperson's residence with N.M.'s DNA present on the barrel, cylinder release button, trigger, and grips.

## II.

Maryland is one of many states "in this country that have enacted post-conviction DNA testing[.]" *Blake v. State*, 395 Md. 213, 218 (2006). In 2001, the General Assembly passed what is now CP § 8-201, "authorizing a person who is convicted of manslaughter, murder in any degree, or first or second-degree rape or sexual offense to file a petition for postconviction DNA testing of 'scientific identification evidence' in the possession of the State that is related to the judgment of conviction." Maryland Fiscal Note, 2001 Sess. S.B. 694. The statute was enacted "in line with a nationwide trend to adopt postconviction DNA testing statutes designed to provide an avenue for the exoneration of the actually innocent." *Blake*, 395 Md. at 219.

CP § 8-201(b)(1) provides that an eligible "person who is convicted of a crime of violence under § 14-101 of the Criminal Law Article may file a petition . . . for DNA testing of scientific identification evidence that the State possesses that is related to the judgment of conviction[.]" An eligible "petitioner may move for a new trial under this section on the grounds that [1] the conviction was based on unreliable scientific identification evidence and [2] a substantial possibility exists that the petitioner would not have been convicted without the evidence." *Id.* § 8-201(c). If the postconviction court finds the DNA results are unfavorable, the petition shall be dismissed. *Id.* § 8-201(i)(1). However, if the "DNA testing [is] favorable to the petitioner, the court shall . . . (iii) on a finding that a substantial possibility exists that the petitioner would not have been convicted if the DNA

10

testing results had been known or introduced at trial, order a new trial." *Id.* § 8-201(i)(2)(iii). Alternatively, "[i]f the court finds that a substantial possibility does not exist under paragraph (2)(iii) of this subsection, the court may order a new trial if the court determines that the action is in the interest of justice." *Id.* § 8-201(i)(3).

"A postconviction court's rulings under CP § 8-201 are subject to direct review by this Court." *Brown v. State*, 431 Md. 576, 583 (2013) (citing CP § 8-201(k)(6)). We review the denial of a motion for a new trial filed pursuant to postconviction DNA testing for abuse of discretion, upsetting the trial court's decision only if it is "well removed from any center mark imagined by the reviewing court and beyond the fringe of what that court deems minimally acceptable." *Arrington v. State*, 411 Md. 524, 552 (2009) (internal citation omitted). In elaborating on the abuse of discretion standard, we explained in *Gray v. State*:

> "Abuse of discretion" is one of those very general, amorphous terms that appellate courts use and apply with great frequency but which they have defined in many different ways.... [A] ruling reviewed under an abuse of discretion standard will not be reversed simply because the appellate court would not have made the same ruling. The decision under consideration has to be well removed from any center mark imagined by the reviewing court and beyond the fringe of what that court deems minimally acceptable. That kind of distance can arise in a number of ways, among which are that the ruling either does not logically follow from the findings upon which it supposedly rests or has no reasonable relationship to its announced objective. That, we think, is included within the notion of "untenable grounds," "violative of fact and logic," and "against the logic and effect of facts and inferences before the court."

388 Md. 366, 383–84 (2005) (internal citations omitted).

In addition to this deferential standard for discretionary rulings, the postconviction court's factual findings are reviewed for clear error. *Brown*, 431 Md. at 583. A factual

11

finding is not clearly erroneous if it is supported by competent evidence in the record. *Simms v. State*, 445 Md. 163, 185 (2015).

In assessing motions based on postconviction DNA testing, courts apply the substantial possibility standard. This Court has interpreted substantial possibility to occupy a middle ground—more demanding than "might [but] less stringent than probable." *McGhie v. State*, 449 Md. 494, 510 (2016). The question is whether the newly discovered evidence creates a substantial possibility that the result of the trial may have been different had the evidence been available at the time. Although this Court has not definitively construed the "interest[] of justice" standard in the context of postconviction DNA testing, it has recognized the breadth of the term in other contexts. *Gray*, 388 Md. at 382 n.7. For example, in *Gray*, this Court noted that the phrase "interest[] of justice" encompasses a "wide array of possibilities[,]" including instances where there has been "ineffective assistance of postconviction counsel or a change made in the law that should be applied retroactively." *Id.*

Here, the only new testing conducted by Bode Technology in April 2024 was on an untested fragment of the Gun Barrel Sample. That test returned a "below the limit of detection" result and no DNA profile. Consequently, the sample was not further processed. Shepperson argues that the absence of DNA on the barrel of the gun would have led jurors to discredit N.M.'s testimony that the barrel was pressed into her mouth to

compel fellatio, thereby creating a substantial possibility of a different outcome.[6]  This

argument falls short under both prongs of CP § 8-201 and provides no basis to conclude

that the postconviction court abused its discretion in denying the motion for a new trial.

A.

Under CP § 8-201(i), a postconviction court may grant a new trial if (1) the DNA

testing yields results "favorable to the petitioner," and (2) there exists "a substantial

possibility" that the petitioner would not have been convicted had those results been

known or introduced at trial, or, alternatively, if the court concludes that a new trial is

warranted "in the interest of justice."  Neither condition is satisfied on the record before

us.

*Favorability*

This Court has held that postconviction DNA results are "favorable" when they

directly refute the State's theory or materially undermine evidence admitted at trial.  *See*

*Thompson v. State*, 411 Md. 664, 689–90 (2009).  In *Thompson*, a woman was found

deceased in her home after she had been stabbed, strangled, and sexually assaulted.  *Id.* at

667.  The day after the victim's body was discovered, the petitioner turned over a knife that

he found near the victim's home and a pair of bloodstained cut-off jeans he claimed to have

on when he found the knife.  *Id.*  During closing arguments, "[t]he State emphasized that

the blood found on [the petitioner's] jeans was the same blood type of [the victim] and

---

[6] There is an error in Shepperson's recollection of N.M.'s testimony.  During the 2009 trial, N.M. testified that the barrel of the gun was put in her mouth during the vaginal rape, stating "[w]hile on the table, while he's still in me having sex with me on the table. . . . He sticks the gun in my mouth and tells me to suck on the gun."

13

linked this with testimony that blood of an unspecified type was found on the murder weapon[,]" stating:

> [T]hat knife is the murder weapon. It is positive for blood. It is consistent with the wound on [the victim's] body and also these pants.
>
> [The petitioner's] shorts, if you will. They test positive in this corner of the pocket for a positive blood. That is the blood of [the victim]. He said when he got the knife the knife was bloody and he put the knife in his pants. Clearly the blood from the knife. And we know there was blood on the knife. It had seeped onto his shorts and he didn't notice.

*Id.* at 670–71 (emphasis and footnote omitted). Although the petitioner was convicted, later DNA testing of the blood on the jeans revealed the blood was not the victim's. *Id.* at 672–73. The postconviction court nonetheless denied a new trial, reasoning that the DNA did not remove the petitioner from the scene and thus did not exculpate him. *Id.* at 674. This Court reversed, holding that the new testing "refuted" the State's theory that the blood linked the petitioner to the murder, and remanded the case for further proceedings. *Id.* at 690.

Unlike in *Thompson*, where the postconviction DNA evidence directly undermined a key pillar of the prosecution's case, the 2024 Bode Technology test did not refute the State's theory or undermine the 2008 BRT Laboratories test of the Gun Barrel Sample that linked the gun to the victim. During the postconviction hearing, the Prince George's County analyst testified that the original 2008 BRT Laboratories testing was conducted on a different portion of the same swab, and that her independent review of the 2008 case file revealed no indication the results were erroneous or cross-contaminated. She further described the condition of the residual sample as sealed in an untorn manila envelope and

14

noted that while DNA can persist "for years, decades" under ideal conditions, the passage of 16 years meant the remaining portion might simply lack enough material to detect.

The 2024 test was not favorable to Shepperson. At most, it could have confirmed the original result, shown that N.M.'s DNA was not present, or, as occurred here, yielded no detectable DNA. A "no detectable DNA" result, like an inconclusive one, is not "favorable" unless it casts doubt on the validity of the initial findings. *Cf. Diggs & Allen*, 213 Md. App. at 66–67 ("an inconclusive test is evidence of nothing"). Because the 2024 test neither refutes the State's theory nor undermines the 2008 analysis, it fails the favorability prong of CP § 8-201(i).

*Substantial Probability*

Even if the 2024 result were deemed favorable to Shepperson, CP § 8-201(i)(2)(iii) requires a showing that "a substantial possibility exists that the petitioner would not have been convicted if the DNA testing results had been known or introduced at trial[.]" This standard demands more than conjecture; it asks whether, in light of the entire trial record, there exists a real possibility of acquittal. Shepperson did not meet that burden.

In *Arrington*, we granted relief where exculpatory postconviction DNA results flatly contradicted the State's trial evidence—serology results that the jury clearly relied upon, as shown by their deliberation notes. 411 Md. at 554–55. By contrast, in *Brown*, where the State never claimed that DNA linked the defendant to the crime, the absence of his DNA on an alleged weapon did not create a substantial possibility of a different verdict. 431 Md. at 589–90. In short, DNA results that do not call into question a material part of the prosecution's theory do not warrant relief under CP § 8-201(i)(2)(iii).

15

This case resembles *Brown* in that the postconviction DNA evidence does not undermine any material aspect of the State's case. The 2024 Bode Technology test did not exclude Shepperson or N.M. as contributors to any DNA profile relevant to the offenses of conviction, and it does not contradict the State's theory that he used a gun to compel N.M. to perform fellatio. N.M. described three distinct acts—forced fellatio, vaginal rape, and anal rape—and testified that the barrel of the gun was inserted into her mouth only during the second act. The jury acquitted Shepperson of the vaginal and anal rape charges. Thus, the "no detectable DNA" result from the 2024 Bode Technology test relates solely to a charge on which he was acquitted and bears no connection to his conviction for forcing N.M. to perform fellatio at gunpoint.

Nor does the 2024 Bode Technology test undermine the rest of the forensic evidence. The original 2008 BRT Laboratories test from a separate portion of the gun barrel identified N.M. as a major contributor. Swabs from the cylinder release, trigger, and grips of the gun found in Shepperson's residence—never retested—also produced mixtures in which N.M. was the major contributor. During the postconviction hearing, the DNA analyst testified that variation in yield across swab fragments is routine, especially after years of storage, and does not suggest flaws in the original testing.

In light of the full record—including the unchallenged 2008 DNA results, the analyst's testimony, and the jury's acquittal on the rape charge linked to the gun barrel-in-mouth allegation—the postconviction court did not abuse its discretion. Its decision to deny a new trial was neither "well removed from the center mark" nor "beyond the fringe of what" is minimally acceptable. *Gray*, 388 Md. at 383.

16

B.

CP § 8-201(i)(3) provides that "[i]f the court finds that a substantial possibility does not exists under paragraph (2)(iii) of this subsection, the court may order a new trial if the court determines that the action is in the interest of justice." While we have not looked at the "interest of justice" in terms of CP § 8-201, we have looked at the "interest of justice" in another context. In *Gray*, we opined that, "[w]hile it is within the trial court's discretion to decide when 'the interest[] of justice' require[s] reopening, . . . some reasons for reopening could include, . . . ineffective assistance of postconviction counsel or a change made in the law that should be applied retroactively." 388 Md. at 382 n.7 (internal citation omitted). Neither of those situations apply here. Certainly, there are other reasons to grant a new trial in the "interest of justice," but such decisions rest in the sound discretion of the postconviction court. Ordinarily, we defer to the postconviction court's judgment on whether the "interest[] of justice" warrants reopening the case unless its decision plainly lacks a logical connection to its factual findings. *See id.* at 383.

The postconviction court's denial of Shepperson's motion for a new trial rests on the "no detectable" DNA result from the 2024 Bode Technology test of the Gun Barrel Sample. CP § 8-201(i)(3), however, cannot be invoked to justify a new trial based solely on the absence of DNA on a different portion of the Gun Barrel Sample tested 16 years after collection—particularly where that evidence pertains to a charge on which Shepperson was acquitted. The 2024 Bode Technology test of the Gun Barrel Sample does not affect assessments of force, the victim's credibility, or any other material element. It does not undermine the non-forensic evidence adduced at trial, such as recovering the gun

17

from Shepperson's residence, N.M.'s accurate description of the gun and bullets used in the sexual assault, Shepperson possessing N.M.'s phone, and witnesses placing Shepperson in the same shopping center on the date and close to the time of the assault. Granting a new trial on that basis would contravene CP § 8-201's requirement of genuinely material new evidence and inject unwarranted uncertainty into convictions supported by a coherent, complete record.

## III.

For all these reasons, we affirm the postconviction court's denial of Shepperson's motion for a new trial. Under the facts of this case, the 2024 Bode Technology test proves nothing. The "no detectable DNA" result related to a charge for which Shepperson was acquitted and was, therefore, neither favorable nor created a substantial possibility that Shepperson would not have been convicted had this evidence been presented to the jury during the original trial in 2009. Nor did the postconviction court abuse its discretion in determining that it was not in the "interest of justice" to grant a new trial.

**JUDGMENT OF THE CIRCUIT COURT FOR PRINCE GEORGE'S COUNTY AFFIRMED. COSTS TO BE PAID BY PETITIONER.**

18